BEAN. (UNITED STATES v.) See Case No. 14,550.

---

## Case No. 1,175.

BEANE et al. v. The MAYURKA.

[2 Curt. 72.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1854.

COLLISION —NEGLIGENCE IN ANCHORING—ADMI-RALTY JURISDICTION—GENERAL AVERAGE.

1. The allegation of negligently anchoring so near to another vessel, as to come in collision in a storm, repelled.

2. There is no maritime lien created by a general average loss, and consequently the admiralty has not jurisdiction in rem.

[Cited in Oologaardt v. The Anna. Case No. 10,545; The Kate Tremaine, Id. 7,622; The John C. Sweeney, 55 Fed. 544.]

3. Where two vessels at anchor come in collision without fault. and it was necessary. to prevent the destruction of both, for one to slip

---

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]

the cable and go ashore, this gave no claim against the other for a salvage service.

[Approved in The John Perkins, Case No. 7,360.]

[4. The admiralty jurisdiction extends to actions ex contractu, quasi ex contractu, ex delicto, and quasi ex delicto.]

[Cited in Banta v. McNeil, Case No. 966.]

[Appeal from the district court of the United States for the district of Massachusetts.

[In admiralty. Libel by Amaziah Beane and others against the schooner Mayurka for collision. The district court rendered a decree for libellants. (Unreported.) The cause is now heard on appeal. Reversed.]

CURTIS, Circuit Justice. This is an appeal from a decree of the district court in a cause of collision. The libel states that the schooner Sarah and Adeline being at anchor inside the breakwater at the mouth of the Delaware bay, on the night of the third of January, 1853, the Mayurka dragged her anchors, drifted foul of the Sarah and Adeline, and after the two vessels had been some time in collision, and while they were both in imminent danger of sinking at their anchors if not extricated, the Sarah and Adeline slipped her cable and drifted to leeward a short distance, let go her small and kedge anchors, held on by them for some hours, and then was driven on shore and wrecked.

The libel is framed in three aspects. First. It alleges that the collision occurred through the negligence of the people of the Mayurka in not having out, proper ground tackle, and not keeping a suitable anchor watch. Second. If there was no such negligence, and the vessels came in collision by inevitable accident, it insists that the cable and anchor of the Sarah and Adeline were voluntarily slipped, for the safety of both vessels, and upon the urgent request of the master of the Mayurka, as the only means of preventing the destruction of both, and that the stranding which followed was a direct and necessary consequence of the voluntary sacrifice of the cable and anchor, and therefore the entire loss should be borne pro rata by both vessels and cargoes as a general average loss. Third. That if this be not so, the libellants should be treated as salvors of the Mayurka.

Upon the first of these questions, the evidence derived from the officers and crews of the two vessels, and of another vessel called the Harbinger, which was anchored near, is even more than usually conflicting. I have carefully examined it, with the endeavor not to reconcile it, for that is plainly impossible, but to arrive at some leading facts, in a manner satisfactory to my own mind. To some extent I have been able to do so; and without detailing the evidence I will state what those conclusions are.

First. I find that the Mayurka came into the harbor before dark and came to anchor, with her best bower; that she does not appear to have drifted before twelve o'clock that night; that just before twelve o'clock, her second anchor was dropped; and about twenty-five fathoms of chain was payed out.

Second. That the Sarah and Adeline came to anchor with her best bower, after dark, on the lee quarter of the Mayurka, and by reason of the scope of her chain, when she swung to her anchor, was somewhat astern of the Mayurka. But I am not satisfied, that any one on board either vessel saw the other vessel, when the Sarah and Adeline came to anchor, nor do I find it possible to determine, with any approach towards precision, how near together they were, when the Sarah and Adeline was first anchored.

Third. I do not attribute this failure to see each other, to the want of a light on board either vessel, for I am satisfied there was no neglect in this particular; nor do I find any want of due care in the selection of a berth, by the Sarah and Adeline. The testimony is direct and strong to prove, that the master had the helm, and the mate and all hands were on the look-out forward, to discern a proper place for anchorage. That they believed they had selected such a place is probable in itself, and, as already stated, there is not sufficient evidence to satisfy me, that in point of fact, the Sarah and Adeline was anchored in dangerous proximity to the Mayurka.

Fourth. I find that after twelve o'clock at night, the ground tackle of the Mayurka was sufficient, and was properly attended to, and that a suitable anchor watch was kept on board. Through what causes the two vessels came together, is the difficult question. The collision occurred in a dark night, a snow-storm, and a violent gale of wind. The Sarah and Adeline was found to be just astern of the Mayurka, heading, in nearly the same direction, and almost immediately struck the boat of the Mayurka with her bowsprit, then came with her bows on the quarter of the Mayurka, her bowsprit sliding along until it was caught between the mainmast and rigging, and in this position the two vessels lay until the chain of the Sarah and Adeline was slipped, and she drifted to leeward. On the one side it is asserted, that the Mayurka drifted on to the Sarah and Adeline; on the other, that the Sarah and Adeline, swinging at one anchor, was forced by a strong current, when the squalls lulled, in the direction of the Mayurka, and thus came in collision. There are very material facts sworn to in the case, which tend, and if they stood alone, would be sufficient to support either hypothesis. I will advert briefly to some of them. The mate of the Mayurka swears he observed the chains carefully after the small anchor was let go; that its chain at no time bore an equal strain with the chain of the best bower. There is much evidence to prove that the relative positions of the Mayurka and Harbinger were not materially changed during the night, and that the latter vessel had both anchors down, and sufficient chain out, and that her master, who seems to have been anxiously vigilant during the night, was not aware that his vessel drifted. The Sarah and Adeline, a vessel of nearly the same size, model, and burden of cargo as the Mayurka, had but one anchor down, and about the same scope of chain out as the Mayurka's best bower had, after twelve o'clock, and is not alleged, and does not appear to have drifted. On the other hand, it is difficult to believe that these two vessels were anchored so near each other, that the Sarah and Adeline could, in that gale, have come up into the wind far enough to reach the Mayurka; and it is very difficult to reconcile the fact, that as soon as her cable was slipped, she immediately went astern, with any other hypothesis than that she was then held by her anchor. I attach some weight, also, to the testimony of the mate of the Sarah and Adeline, concerning the manner in which the two vessels came together. It was also urged that the Mayurka did not drift after the collision. But more scope was given to her chains after the collision. How soon after, does not satisfactorily appear. If immediately after, it would have a tendency to prove, that her people thought she had been drifting and needed more scope to hold her. Some of them say, it was a considerable time after the collision, that more chain was let out. Length of time is a fact, extremely difficult to be judged of with accuracy, on such occasions, and I have not been able to allow much force to this circumstance. On the whole, I think the evidence so far preponderates in favor of the hypothesis that the Mayurka did drift, that I consider the Sarah and Adeline relieved from the blame which would be attributable to her, if it had sufficiently appeared that the disaster was caused by her anchoring so near the Mayurka, that she was carried by the tide in collision with her. The result to which I have come upon the best consideration I have been able to give to the evidence, relieves both vessels of blame, and attributes the disaster to a vis major merely. Of course the libellant cannot recover, treating this as a simple cause of collision, and in this respect the decree of the district court must be affirmed.

It remains to consider the other claims;— and first, that for a general average contribution. This is a novel question of much interest. Whether such a claim can ever exist save as between those who have voluntarily embarked their several property in a common adventure, is worthy of great consideration. But I do not feel at liberty to express any opinion upon it, because I consider there is not jurisdiction in the admiralty to try and determine it. In Stainback v. Rae, 14 How. [55 U. S.] 532, it was settled, that where a loss happens from a collision which is the re-

sult of inevitable accident, without negligence or fault of either party, each should bear his own loss. Viewed, therefore, simply as a case of collision, and damage proceeding therefrom, the libellants have no valid claim. The question is, whether in a proceeding in rem, the admiralty may examine, whether a voluntary sacrifice was made, to diminish the damage which would otherwise have been suffered, from a collision without fault, and may pronounce in favor of a lien, upon the vessel benefited by the sacrifice. I say, pronounce in favor of a lien upon that vessel, because it is clear, if there is not a maritime lien on the vessel proceeded against, for the amount due on contribution, there can be no decree against that vessel. I consider a proceeding in rem in the admiralty, to be a proceeding to give effect to a maritime lien arising either ex contractu or quasi ex contractu, or ex delicto, or quasi ex delicto, and that such a lien must always exist, to form the basis of such a proceeding. This is very clearly, and I think accurately stated by Lord Chief Justice Jarvis, in the case of Harmer v. Bell, 22 Eng. Law & Eq. 72, decided by the privy council in 1852. "A maritime lien is the foundation of all the proceedings in rem, a process to make perfect a right inchoate, from the moment the lien attaches; and whilst it must be admitted that where such a lien exists, a proceeding in rem may be had, it will be found to be equally true, that in all cases where a proceeding in rem is the proper course, there a maritime lien exists, to be carried into effect by legal process." See, also, The America, [Case No. 288,] and cases there cited. If, then, this rests upon the existence of a maritime lien on the vessel proceeded against, we must find such a lien here, or the process is misapplied. That no lien, or privilege to secure any thing, arose from the collision, is clear. There was no claim, whatever, growing out of the collision. The vessels being in collision without fault, and being relieved from it by a voluntary sacrifice of their property, it is maintained by the libellants that they have a claim for contribution. Suppose this admitted, does the maritime law create a lien on the claimant's vessel, to the extent of its contributory share. This is settled in the negative by the case of Cutler v. Rae, 7 How. [48 U. S.] 729. It was there held, that the maritime law does not confer a lien, to secure contribution in general average; that the only lien which existed, was a common law lien, dependent on possession, and lost when the possession was terminated. In this case, there never was any possession by the libellants of the vessel of the claimants, and it necessarily follows from this decision, that no lien of any kind ever existed. At all events, it seems to me, that without departing from this decision, I cannot say the libellants have a maritime lien on the vessel proceeded against, for the contribution due, for the relief of that

vessel from collision; and, consequently, I must pronounce against the libel on this ground.

As to the claim for salvage, I am of opinion it cannot be maintained. These vessels were subject to a common peril, which threatened the immediate destruction of both. It is testified by all the libellants' witnesses, that if not relieved from it, they must both have sunk at their anchors. Finding this to be so, and that he could not otherwise release his own vessel, the master of the Sarah and Adeline slipped his cable. It was his imperative duty to do so, to save his own vessel and cargo, and the lives on board. To constitute a salvage service, there must be a voluntary interposition to save another's property, by one under no legal obligation to render the service. But this master was under a perfect legal obligation to do all he did, wholly independent of the safety or danger of the other vessel. In the case of The Branston, 2 Hagg. Adm. 3, where a passenger had successfully exerted himself to save the ship and cargo, and the lives of those on board, Lord Stowell denied his claim for salvage, upon the ground, that where there is a common peril, it is the duty of all, to contribute to the general safety. There are other cases, in which passengers as well as others standing in different relations to the ship, have been allowed salvage, but only when they have assumed responsibilities and rendered services, which could not be required of them in the performance of any duty. I do not consider that what this master did, under a clear legal obligation to his owners and to his crew, to save his own vessel, is in the nature of a salvage service, because it also benefited others. It may be that the property of others benefited, should bear some portion of the loss voluntarily incurred, but this rests upon the law of general average, if anywhere, and not upon a claim for salvage compensation; and to treat this as a salvage service, would so confound these distinct subjects, as to produce great confusion and mischief. As the claim for a general average contribution was allowed in the district court, the decree must be reversed and the libel dismissed, as to that claim, for want of jurisdiction, but without costs.