## THE CUZCO.

(District Court, W. D. Washington, N. D. June 19, 1915.)

No. 2832.

1. SHIPPING ☞73—LIABILITY FOR TORTS—LAW GOVERNING—"HIGH SEA."

The term "high sea" does not apply to the waters of a port or harbor, and while a tort committed on the high sea is amenable to the law of the ship's flag, one committed on a vessel in the port or harbor of another country is governed, as to the rights of the person injured, exclusively by the law of such country.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. ☞73.

For other definitions, see Words and Phrases, First and Second Series, High Seas.]

2. MARITIME LIENS ☞1—LAW CREATING.

A maritime lien is a matter of substantive law and not of procedure, and cannot be created by the courts.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 1; Dec. Dig. ☞1.]

3. SHIPPING ☞73—SUIT IN REM FOR MARITIME TORT—LAW GOVERNING.

A stevedore, injured through the fault of those in charge of a vessel which he was helping to discharge in a port of British Columbia, the laws of which country do not give a lien for such injury, cannot maintain a suit in rem against the vessel therefor in a court of admiralty of the United States.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. ☞73.]

In Admiralty. Suit by Joseph H. O'Brien, by his guardian Henry J. Gorin, against the steamship Cuzco, Aktieselskabet Cuzco, claimant, On exceptions to special plea. Overruled.

The amended libel alleges, in substance, that the libelant, Joseph H. O'Brien, is a citizen of the United States of America, a resident of this district, and on the 3d of March, 1913, was adjudged by the state court to be non compos mentis, and Henry J. Gorin was appointed his guardian, and that this action is commenced by authorization of the state court; that the steamship Cuzco is engaged in navigating the high seas and waters of Puget Sound, and was, at the time of filing the libel, lying in the harbor of Seattle, and further alleges (paragraph 3): "That on or about the 10th day of October, 1912, the said steamship was lying at the chemical docks at Victoria, British Columbia, discharging a cargo of niter, and libelant, Joseph O'Brien, was, with other laborers or stevedores, assisting in discharging said cargo from said ship under the supervision of the captain and mate of said ship and under the immediate direction of one John Hanley, hatch tender, whose said orders libelant was compelled to obey. That at about the hour of 2:30 o'clock p. m. of said

---

10th day of October, 1912, the said cargo had been fully discharged, and under the orders and direction of said Hanley and one John Doe, the mate of the steamship Cuzco, whose name is now unknown to libelant, this libelant and other stevedores began to prepare the said steamship for sailing, and while this was being done, as aforesaid, libelant was ordered by the said hatch tender, John Hanley, and said mate to hurriedly replace the No. 3 hatch. That libelant, to the best of his ability, using all necessary care, skill, and caution, immediately attempted to carry this order into execution, but while so doing, without any fault or negligence on his part, he fell through the said hatchway, a distance of approximately 30 feet, striking upon his head and shoulder. That libelant thereafter suffered a deep gash upon the head and a fracture of the skull, all of which injuries were treated at the Sisters' Hospital, Victoria, B. C., until said Joseph O'Brien was removed to the asylum for the insane at New Westminster, British Columbia for treatment, at which latter place he remained for a period of 15 months, during all of said time being wholly non compos mentis as a result of the said fall. That said Joseph O'Brien's mind is not now clear, nor is he yet rational and sane, nor will he ever be, and his mind and memory are permanently impaired; that said Joseph O'Brien will be prevented forever from doing any manner of work or labor whatsoever to support himself, and will always be helpless and dependent upon others, or upon charity as a result of said injuries sustained by him, as aforesaid. That at the time libelant was injured he was working as a stevedore for a stevedoring company known as the Empire Stevedoring Company, and which libelant believes to have been a corporation. That said stevedoring company was employed by the master of said steamship Cuzco and had a contract with said master and the owners of said vessel to discharge freight therefrom, and the work of replacing said hatch was a part of the work contemplated by the employment of said stevedoring company by said master and the owners of said ship, and libelant was at a place where he was required to be and where the master and owners of said ship expected him and others would be, pursuant to and under the authority of said employment and contract, whereby said stevedoring company was to employ and use men in discharging the cargo from said ship"—and then alleges acts of negligence on the part of the ship which resulted in his injury, and asks damages in the sum of $25,000, and prays that monition issue against the steamer by attachment, etc., and the vessel be condemned and sold to pay libelant's claim and costs. Claimant has filed a plea and answer to the amended libel, stating, in substance, that it is the sole owner of the Cuzco, her tackle, machinery, etc., that claimant is a corporation of the kingdom of Norway, and that the tort set forth did take place on board the steamship Cuzco at a time when the said steamship was lying at the docks in the city of Victoria, province of British Columbia, Dominion of Canada, and that by the law of the province of British Columbia, Dominion of Canada, in force at the time of the tort complained of, no maritive lien against the steamship Cuzco existed for the tort set forth, if any such tort did take place, and "that this honorable court, by reason of the matters and things so above propounded and articulated, has not jurisdiction, and ought not to proceed to enforce the claim alleged in the amended libel;" and then, without waiving any of its rights under the plea, answers the libel and denies the allegations contained therein. It is stipulated that the issue raised by the sufficiency of the plea shall be determined by the court without prejudice to the answer of claimant, and before further proceedings are taken, so that if sustained, expense incident to the taking of testimony would not be incurred.

George Olson and J. Grattan O'Bryan, both of Seattle, Wash., for libelant.

Hughes, McMicken, Dovell & Ramsey and Otto B. Rupp, all of Seattle, Wash., for claimant.

NETERER, District Judge (after stating the facts as above). The record is conclusive that at the time of the injury libelant was en-

gaged as a stevedore in discharging the cargo from a vessel owned by a Norwegian corporation, while the vessel was lying at the docks at Victoria, British Columbia. The exceptions, for the purposes of this issue, admit that no maritime lien existed against the Cuzco under the law of British Columbia. The question for the court now is to determine whether the rights of the parties are governed by the lex loci delicti or by the lex fori, and whether an action in rem is of the substantive law of British Columbia, or only a form of procedure or process of the court of the United States.

Attention is first directed as to what law determines the right of the parties. Proctors for claimant have learnedly elaborated upon the issue, and have called attention to comment of eminent jurists, from Bartolus, the Italian jurist of the fourteenth century, who declared that an action for tort is governed by the law of the place where the tort arose (Bartolus on Conflict of Laws, c. 2, Oxford Univ. Press Ed. 1914, p. 23) as well as the contrary view held by Savigny and his followers, and the fact that the doctrine laid down by Savigny is not unchallenged even in Germany, and have quoted from the monumental work on Private International Law, by Dr. Bar, the assessor to the Royal Court of Hanover, a jurist of eminence, who, after saying that Wachter and Savigny are the only authorities who challenge the rule announced by Bartolus, says:

"This reasoning, however, overlooks the fact that a state can make no claim to rule men's conduct and behavior except within its own boundaries, and that a rule of conduct, which may be quite proper within our territory, may possibly be unsuitable for any other. The result is: First, that in any case conduct which does not give a right to damages or penalty by the law of the place where the act is committed cannot have this effect if the action be raised in another country. The opposite view plainly implies an invasion of the sovereign power of the state within whose territory the act in question has taken place. * * * To determine the matter by the lex fori, where the lex loci actus gives no claim, or one that does not go so far, is utterly unjust, and all the more that it rests on the good pleasure of the pursuer in many cases whether the action shall be raised at this or at that place. * * * The great balance of opinion at the present time on the continent of Europe is in favor of determining obligations ex delictis by the lex loci actus, at least in so far as the question of damages is concerned. Whereas the law of England and that of the United States seem only to sanction claims upon delicts or quasi delicts, in so far as these claims are good both by the lex fori and the lex loci actus." Bar's Private International Law, par. 286 (translation by G. R. Gillespie [2d Ed.] Edinborough, 1892).

Many sayings by recognized commentators are cited by claimant in support of its contention.

"There is no doubt of the general rule that when an action is brought in one country for acts which have taken place in another, the rights and merits of the case are to be decided by the law of the place where the acts occurred." Wheaton on International Law, pt. 2, c. 2, par. 144a (4th English Ed. p. 229).

"The reciprocal rights and duties of the parties and the defenses that may be invoked to escape liability for a breach of duty are governed by the law of the place where the tort occurred, rather than by the law of the forum." Wharton on Conflict of Laws (3d Ed.) par. 478b.

"Whether an act done in a foreign country is or is not a tort (i. e., a wrong for which an action can be brought in England) depends upon the combined effect of the law of the country where the act is done (lex loci delicti com-

missi) and of the law of England (lex fori).   Dicey on Conflict of Laws (2d Ed. 1908) p. 645.

"The wrongfulness of the conduct complained of as a cause of action- in tort is determined:   (a) By the lex loci, and not by the lex fori; and ordinarily (b) by the state of facts existing at the commencement of the action." Jaggard on Torts, p. 102.

Whatever the rule may be in other civilized countries of the world, the Supreme Court of the United States, in 1838, through Chief Justice Taney, in Smith et al. v. Condry, 1 How. 28, 11 L. Ed. 35, held that the question of whether there is a legal liability for the consequences of a collision in an English port must be determined by the law of England.   Libelant contends that the tort is a maritime tort, committed while the vessel was "on navigable waters (at the wharf at Victoria, B. C.)" and therefore within the jurisdiction of this court as a court of admiralty, and that the admiralty law of the United States, or the lex fori, should control, and cites The Brantford City (D. C.) 29 Fed. 383; Elder Dempster Shipping Co. v. Pouppirt, 125 Fed. 732, 60 C. C. A. 500; Panama Ry. Co. v. Napier Shipping Co., 166 U. S. 285, 17 Sup. Ct. 572, 41 L. Ed. 1004; The Scotland, 105 U. S. 30, 26 L. Ed. 1001; The Belgenland v. Jensen, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152—and cites in support of the right of a stevedore to recover damages for injuries received in loading a ship through the negligence of the vessel or its master or officers in charge, while in the employ of a master stevedore, The Anaces, 93 Fed. 240, 34 C. C. A. 558; The Troop, 128 Fed. 856, 63 C. C. A. 584; The Brookby (D. C.) 165 Fed. 95, and The General De Sonis (D. C.) 179 Fed. 126.   This court has held that a stevedore injured through the negligence of the vessel while engaged in loading or unloading a ship is entitled to recover damages sustained.   The Rupert City (D. C.) 213 Fed. 263.

Judge Brown, in The Brantford (D. C.) supra, at page 382 of 29 Fed., said:

"It is well settled, however, that responsibility for torts committed within the exclusive jurisdiction of the country of the forum, and affecting its own citizens, are determined according to its own laws"

—and further says:

"It is only as respects tortious acts committed beyond its jurisdiction that any doubt has existed as to the remedy to be afforded.   In the latter cases, the principle generally accepted is that, to entitle the suitor to recover in a foreign forum, the act must have been tortious according to the law of the jurisdiction wherein it was committed, as well as by the law of the forum. West. Int. Law, par. 186; Whart. Confl. Laws, pars. 475–478; Foote, Priv. Int. Law, 393, 410; Phillips v. Eyre, L. R. 4 Q. B. 225.   But inasmuch as the high seas are the common ground of all nations, and are not governed by the merely municipal laws of either, the quality of acts committed on the high seas, as between persons or ships belonging to different nations, whose laws are different, is determined by the maritime law as accepted and administered in the forum where the suit is prosecuted.   Hence acts, tortious by the law of England, if committed on the high seas,. are actionable in England, though not tortious by the municipal law of the defendant's domicile, or of the ship's flag; and, in general, the law of the flag has no application to torts committed on the high seas, as between persons or ships of different countries having different laws.   Foote, Priv. Int. Law, 398, 403; Mars. Coll. (2d Ed.) 208, 209, 212.   The point was distinctly presented and so adjudged, in the

case of The Leon, 6 Prob. Div. 148. The same rule in this country has been repeatedly affirmed by the Supreme Court. The Scotland, 105 U. S. 24, 29 [26 L. Ed. 1001]; The Belgenland, 114 U. S. 355 [5 Sup. Ct. 860, 29 L. Ed. 152]."

This was an action to recover for the loss of cattle through negligence of the ship, in that they were improperly stowed, and that the fittings for the cattle and ventilation were insufficient, and the navigation unskillful and negligent. Acts of negligence were denied and stipulations in the bill of lading were set up as a further defense. The conclusion of Justice Brown in that case upon which he retained jurisdiction was based, not upon any negligence upon the high seas, but rather upon the contract made in the United States, as well as the recitation in the bill of lading. The negligence, it was found, arose within the United States and in part upon the high seas, and Judge Brown held that since acts complained against were committed in the United States and upon the high seas, this court should retain jurisdiction.

In Elder Dempster Shipping Co. v. Pouppirt, supra, libelant was an American citizen shipping from an American port, and was injured upon the high seas.

In The Egyptian (D. C.) 36 Fed. 773, it was held that the jurisdiction of the high court of admiralty of England does not extend to a claim for damages by a seaman for personal injuries received on board an English ship while within the body of a county of England, and that an American citizen could not maintain a proceeding in rem for personal injuries received on board an English ship while within the English territorial waters, but was governed by the law of England.

The issue here is not as to the jurisdiction of this court as an admiralty court to entertain the complaint made, but rather as to the law which should govern, there being a difference between the law of British Columbia and the law of the United States with relation to such a complaint. The authorities cited by libelant are not convincing, and therefore not controlling, and while the decisions upon issues raised upon the enforcement of common-law rights are not taken as precedents in admiralty, yet where the principle involved is with relation to the law which should control or govern an alleged wrong, I think the same principle applies in the determination of common-law liabilities as obtains with relation to rights enforceable in admiralty. The Supreme Court of the United States does not seem to have departed from the rule laid down in Smith v. Condry, supra, and while expression of a different tendency may be found in some of the English cases, the court has not deviated from the rule. And it would seem that reason would justify such a conclusion. In Slater v. Mexican Ry. Co., 194 U. S. 120–126, 24 Sup. Ct. 581, 582 (48 L. Ed. 900), the widow and children of Slater, who was killed in Mexico through the negligence of the railway company, sought to recover damages under the provisions of the statute of Texas, and Justice Holmes, for the court, said:

"As Texas has statues which give an action for wrongfully causing death, of course there is no general objection of policy to enforcing such a liability there, although it arose in another jurisdiction. Stewart v. Baltimore &

Ohio R. R., 168 U. S. 445 [18 Sup. Ct. 105, 42 L. Ed. 537]. But when such a liability is enforced in a jurisdiction foreign to the place of the wrongful act, obviously that does not mean that the act in any degree is subject to the lex fori, with regard to either its quality or its consequences. On the other hand, it equally little means that the law of the place of the act is operative outside of its own territory. The theory of the foreign suit is that, although the act complained of was subject to no law having force in the forum, it gave rise to an obligation, an obligation which, like other obligations, follows the person, and may be enforced wherever the person may be found. Stout v. Wood, 1 Blackf. (Ind.) 71; Dennick v. Railroad Co., 103 U. S. 11, 18 [26 L. Ed. 439]. But as the only source of this obligation is the law of the place of the act, it follows that that law determines, not merely the existence of the obligation (Smith v. Condry, 1 How. 28 [11 L. Ed. 35]), but equally determines its extent."

In Western Union Tel. Co. v. Brown, 234 U. S. 542, 546, 34 Sup. Ct. 955, 956 (58 L. Ed. 1457), Mr. Justice Holmes again said:

"Whatever variations of opinion and practice there may have been, it is established as the law of this court that when a person recovers in one jurisdiction for a tort committed in another, he does so on the ground of an obligation incurred at the place of the tort that accompanies the person of the defendant elsewhere, and that is not only the ground, but the measure, of the maximum recovery."

Chief Justice Taney, in Smith v. Condry, supra, said:

"The collision having taken place in the port of Liverpool, the rights of the parties depend upon the provisions of the British statutes, then in force; and if doubts exist as to their true construction, we must of course adopt that which is sanctioned by their own courts."

Judge Thomas, in The Lamington (D. C.) 87 Fed. 752, said:

"The action is founded in tort; hence the liability must be determined by the law of the place where the alleged tortious act was committed or suffered."

The Court of Appeals of New York, in McDonald v. Mallory, 77 N. Y. 546, 550 (33 Am. Rep. 664), said:

"The liability of a person for his acts depends, in general, upon the laws of the place where the acts were committed, and although a civil right of action acquired, or liability incurred, in one state or country for a personal injury may be enforced in another to which the parties may remove or where they may be found, yet the right or liability must exist under the laws of the place where the act was done."

[1, 2] This is not a common-law action for the recovery of damages. It being a proceeding in rem, the process of procedure in a jurisdiction where a lien is created by local laws or recognized by the admiralty courts within their special jurisdiction cannot create a lien; but it must be a lien which is created by the admiralty law, or by the local laws in which the wrong complained of occurred.

"No process nor procedure of the court gives life to the lien, but the lien, of its own force, justifies the procedure in rem. * * * In the case of The Bold Buccleugh, 7 Moore, P. C. 267, Sir John Jervis, delivering the opinion, says: 'A maritime lien is well defined by Lord Tenterden to mean a claim or privilege upon the thing to be carried into effect by legal process, and Mr. Justice Story (The Nestor, 1 Summ. 73, Fed. Cas. No. 10,126) explains that process to be a proceeding in rem, * * * and, indeed, is the only court competent to enforce it. A maritime lien is the foundation of the proceeding in rem, a process to make perfect a right inchoate from the moment the lien attaches; and, whilst it must be admitted that where such a lien exists a

proceeding in rem may be had, it will be found to be equally true that in all cases where a proceeding in rem is the proper course, there a maritime lien exists which gives a privilege or claim upon the thing to be carried into effect by legal process.'" The Lamington (D. C.) 87 Fed. 755.

The Bucclough has received indorsement in The Rock Island Bridge, 6 Wall. 213, 215 (18 L. Ed. 753), in which Mr. Justice Field, speaking for the court, said:

"The lien and the proceeding in rem are therefore correlative—where one exists, the other can be taken, and not otherwise. Such is the language of the Privy Council in the decision of the case of The Bold Bucclough."

The decision in The Bold Bucclough would seem to reverse or modify the prior decision of the Privy Council of England, in which it refused to follow the American case of Smith v. Condry, supra.

"The decision in The Bold Bucclough has never been departed from in England, but has been constantly recognized as sound law in the courts exercising admiralty jurisdiction (citing cases). And in a very recent case in the House of Lords, that decision has been deliberately and finally declared to have established beyond dispute, in the maritime law of Great Britain, that a collision between two vessels by the fault of one of them creates a maritime lien on her for the damage done to the other. Currie v. McKnight (1897) App. Cas. 97." Mr. Justice Gray in The John G. Stevens, 170 U. S. 113, 116, 18 Sup. Ct. 544, 545 (42 L. Ed. 969).

"A lien being a right of property and not a matter of procedure" (The J. E. Rumbell, 148 U. S. 1, 11, 13 Sup. Ct. 498, 500 [37 L. Ed. 345]; Beane v. Mayurka, 2 Curt. 72, 76, Fed. Cas. No. 1,175), it would appear that the rights of the parties must be determined by the lex loci delicti. It is admitted by the record that no maritime lien existed against the Cuzco for the alleged injury, by the laws of British Columbia, and it is concluded that by the law of this jurisdiction the question of a lien or no lien is a part of the substantive law, and not a mere matter of process or procedure.

The exception of the libelant that claimant is a corporation of the kingdom of Norway and the steamship Cuzco was flying the flag of Norway at the time of the injury complained of, cannot be well taken. While no argument was presented by libelant upon this exception, or authority cited, it appears that the Norwegian Maritime Code, July 20, 1893, does not give a maritime lien for personal injuries suffered by a stevedore; hence the fact, as claimed by libelant, that the law of the country is supposed to follow its ships upon the high seas—"is a detached floating portion of the country whose flag it flies and under whose laws it is registered" (The Lamington, supra)—does not afford him relief. Ships are regarded as floating portions of the nation to which they belong, and whose flag they fly, and while they are upon the high seas, the jurisdiction of the flag obtains, and the law and rule of decision of the flag's jurisdiction obtain, and all on board are regarded as being on the soil of the vessel's nation (1 Calvo, Droit Int. [4th Ed.] 552, book vi, § 3); Bluntschli, par. 317; 1 Vattel, c. 19, par. 216; 2 Rutherford, c. 9, pars. 18, 19; 1 Kent, p. 26; Wheaton [8th Ed.] par. 106; 1 Wharton, Int. Law Dig. par. 26), and a tort committed upon the high seas is therefore amenable to the law of the ship's flag.

"The law of the flag is the lex loci delicti." Minor, Conflict of Laws, par. 195; Crapo v. Kelly, 16 Wall. 610, 624, 625, 626, 21 L. Ed. 430; International Nav. Co. v. Lindstrom, 123 Fed. 475, 60 C. C. A. 649; La Bourgogne, 139 Fed. 433, 71 C. C. A. 489; Viscount de Valle Da Costa v. Southern Pac. Co., 176 Fed. 843, 100 C. C. A. 313; Beyer v. Hamburg-American S. S. Co. (C. C.) 171 Fed. 582; Wharton on Conflict of Laws (3d Ed.) par. 480b; Webster's Works (Natl. Ed.) vol. 2, p. 306.

"A ship in port, however, is subject to the law of the port." Wharton on Conflict of Laws (3d Ed.) p. 786; Woolsey on International Law, par. 64; Webster's Works (Natl. Ed.) vol. 2, p. 307.

The Cuzco was lying at the dock in Victoria, in the waters of the harbor of British Columbia. The tort complained of was therefore not committed on the high seas.

"The maritime territory of every state extends to the ports, harbors, bays, mouths of rivers, and adjacent parts of the sea inclosed by headlands belonging to the same state. The general usage of nations superadds to this extent of territorial jurisdiction a distance of a marine league, or as far as a cannonshot will reach from the shore along all the coasts of the state. Within these limits, its rights of property and territorial jurisdiction are absolute, and exclude those of every other nation." Wheaton on International Law (4th Eng. Ed.) p. 275.

"The exclusive jurisdiction of a nation extends to the ports, harbors, bays, mouths of rivers, and adjacent parts of sea inclosed by headlands, and also to the distance of a marine league, or as far as a cannon shot will reach from the shore along all its coasts." Mr. Buchanan, Sec. of State, to Mr. Jordan, January 23, 1849.

See to same effect Gallatin's Writings, II, 186.

"The term 'high seas' does not, in either case, indicate any separate and distinct body of water, but only the open waters of the sea or ocean, as distinguished from ports and havens and waters within narrow headlands on the coast. This distinction was observed by Latin writers between the ports and havens of the Mediterranean and its open waters, the latter being termed the high seas." United States v. Rodgers, 150 U. S. 249, 14 Sup. Ct. 109, 37 L. Ed. 1071.

"The high sea, the open sea, are phrases used to distinguish the expanse and mass of any great body of water, from its margin or coast, its harbors, bays, creeks, inlets." Benedict's Admiralty (4th Ed.) par. 160.

The court, in United States v. Morel, Fed. Cas. No. 15,807, says:

"Writers of high authority on this subject make a clear distinction between the main sea or the high sea, and roads, harbors, and ports, and we shall see that Congress had these distinctions in view in framing the act in question. Lord Hale, in the fourth chapter De Juris Maris, says: 'That part of the sea which lies not within the body of a country is called the main sea or ocean.' In the second chapter of the second part he describes a road to be 'an open passage of the sea, which, though it lies out at sea, yet in respect of the situation of the land adjacent, and the depth and wideness of the place, is a safe place for the common riding or anchoring of ships.' 'A haven is a place of a large receipt and safe riding of ships, so situate and secured by the lands circumjacent that the vessels thereby ride and anchor safely, and are protected by the adjacent land from dangerous and violent winds.' 'A port is a haven, and somewhat more,' that is, for arriving and unloading ships, etc. * * * Mr. Webster, in his argument of Bevans' Case, Fed. Cas. No. 14,589, says there is a distinction between the meaning of the terms 'high sea' and 'sea'; that the high seas import the open, uninclosed ocean without the fauces terræ, and he is not contradicted by the opposite counsel. Certainly ports and harbors which lie within the body of a country are not part of the high seas according

to Lord Hale's definitions. This learned lawyer further says, and we think with good reason, that 'the common and obvious meaning of the expression "high seas" is also its true legal meaning. The expression describes the open ocean where the dominion of the winds and waves prevails without check or control. Ports and harbors, on the contrary, are places of refuge in which protection and shelter are sought, within the inclosures and projections of land.' "

Justice McKenna, in Humboldt Lumber Mnfrs. Assn' v. Christopherson, 73 Fed. 242, at page 247, 19 C. C. A. 481, at page 489 (46 L. R. A. 264), quotes from Judge Hopkinson's charge in U. S. v. Kessler, Baldw. 15, Fed. Cas. No. 15,528, and for its validity the case of The Ann (decided by Judge Story), 1 Gall. 62, Fed. Cas. No. 397, in which the learned judge said:

"All the writers upon public law agree that every nation has exclusive jurisdiction to the distance of a cannon shot, or marine league, over the waters adjacent to its shores; and this doctrine has been recognized by the Supreme Court of the United States. Indeed, such waters are considered as a part of the territory of the sovereign"

—and for the court said that the law of California in force at the time of the casualty furnished to the court the rule of decision applicable to the question as to the rights of the widow and children to recover for the death of the husband and father through the negligence of the defendant corporation. In that case the act complained of took place about two miles from shore. The Cuzco I do not think was upon the high seas. In the instant case libelant was not a seaman. The ship was not his home. The casualty did not occur on the high seas. He was engaged as a stevedore, discharging the ship's cargo at the dock in Victoria, B. C. At the time of the alleged injury neither the law of British Columbia nor the law of the ship's flag allowed a lien on the ship for damage occasioned by such injury. The law not giving it, this court cannot create it. The fact that he was a citizen of the United States does not enlarge his right (Slater v. Mexican Ry., supra), nor give this court power to extend the laws of this jurisdiction over a foreign country.

The Scotland, 105 U. S. 24, 26 L. Ed. 1001, cited by libelant, does not elucidate his claim. In that case, Justice Bradley, for the court, said:

"In administering justice between parties it is essential to know by what law, or code, or system of laws, their mutual rights are to be determined. When they arise in a particular country or state, they are generally to be determined by the laws of that state. Those laws pervade all transactions which take place where they prevail, and give them their color and legal effect. Hence, if a collision should occur in British waters, at least between British ships, and the injured party should seek relief in our courts, we would administer justice according to the British law, so far as the rights and liabilities of the parties were concerned, provided it were shown what that law was. If not shown, we would apply our own law to the case. In the French or Dutch tribunals they would do the same. But, if a collision occurs on the high seas where the law of no particular state has exclusive force, but all are equal, any forum called upon to settle the rights of the parties would prima facie determine them by its own law as presumptively expressing the rules of justice: but if the contesting vessels belonged to the same foreign nation, the court would assume that they were subject to the law of their nation, carried under their common flag, and would determine the controversy accordingly. If they belonged to different nations, having different laws, since it would be unjust to apply the laws of either to the exclusion of the other, the law of the forum, that is, the maritime law as received and practiced therein, would

properly furnish the rule of decision. In all other cases, each nation will also administer justice according to its own laws. And it will do this without respect of persons, to the stranger as well as to the citizen. If it be the legislative will that any particular privilege should be enjoyed by its own citizens alone, express provision will be made to that effect. Some laws, it is true, are necessarily special in their application to domestic ships, such as those relating to the forms of ownership, charter party, and nationality; others follow the vessel wherever she goes, as the law of the flag, such as those which regulate the mutual relations of master and crew, and the power of the master to bind the ship or her owners. But the great mass of the laws are, or are intended to be, expressive of the rules of justice and right applicable alike to all."

Justice Holmes emphasizes the thought of the court, in Cuba Ry. Co. v. Crosby, 222 U. S. 473–478, 32 Sup. Ct. 132 (56 L. Ed. 274, 38 L. R. A. [N. S.] 40), when he says:

"The language of Mr. Justice Bradley in The Scotland, 105 U. S. 24 [26 L. Ed. 1001], with regard to the application of the lex fori to a case of collision between vessels belonging to different nations and so subject to no common law, referred to that class of cases and no others, and was used only in coming to the conclusion that foreign vessels might take advantage of our Limited Liability Act. * * * But as to causes of action arising in a civilized country the disregard of the foreign law occasionally indicated by some English judges before the theory to be applied was quite worked out must be disregarded in its turn. The principle adopted by the decisions of this court is clear. See, also, Dicey, Confl. of Laws (2d Ed.) 647 et seq."

[3] All of the cases cited by libelant are readily distinguished from the issue at bar. The lex loci delicti determines the rights and liabilities. The act complained of taking place in the territorial waters of British Columbia, and under that law no maritime lien being given for personal injuries suffered by a stevedore, the exceptions to the special plea are denied.