# THE WEST CHEROW.

## THE PENDRECHT.

(District Court, E. D. Virginia. October 21, 1921.)

**1. Collision ⊂⊃72 (1)—Between vessels at anchor due to faults of both.**

A collision during a high wind between the steamship West Cherow, light and high out of the water, and the steamship Pendrecht, which was low in the water, both at anchor in an open roadstead where there was abundant room, *held* due to faults of both vessels, the primary fault being that of the Pendrecht, which anchored last, in failing to give the West Cherow sufficient berth room, and the West Cherow being in fault for failing to move up on her anchor chain or to take other precautions when danger of collision became imminent because, owing to her height above the water, she began to be driven by the wind against the tide and toward the other vessel, which was held by the tide.

**2. Admiralty ⊂⊃4—Court has jurisdiction of suit in rem for collision occurring in Portuguese waters.**

A court of admiralty of the United States *held* to have jurisdiction of a suit in rem against a foreign vessel found within its jurisdiction for a collision which occurred in Portuguese waters, but in an open roadstead largely used in world commerce, though the law of Portugal, while recognizing the liability of a vessel to a lien for a maritime tort arising from collision, provides for establishment of such liability primarily by a suit in personam against the owner or master.

In Admiralty. Libel and cross-libel for collision between the steamships West Cherow and Pendrecht. Decree dividing damages.

J. Frank Staley and H. T. Atkins, Sp. Asst. Attys. Gen., for the West Cherow.

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Kirlin, Woolsey, Campbell, Hickox & Keating, and William H. Mc-Grann, all of New York City, and Baird, White & Lanning, of Norfolk, Va., for the Pendrecht.

WADDILL, Circuit Judge. [1] The facts of the case are briefly these: The West Cherow, a large ship owned by the United States, 410 feet 5 inches long, 54 feet beam, and 29 feet 9 inches deep, and 8,582 dead weight tonnage, light, anchored under the direction of an official pilot in the roadstead of the Fayal Channel, in the Azores, on 75 fathoms of chain, on the evening of the 3d of February, 1920. Late in the evening of the following day, the Dutch steamship Pendrecht, an oil tanker 242 feet long, 18 feet beam, and 1,589 gross tons, also anchored in the immediate vicinity on 60 fathoms of chain, about 300 to 400 feet aft of the West Cherow. The ships remained in these positions, apparently swinging safely with the tides, until that evening of the 5th of February, when, about 12 o'clock noon on that day, a breeze set in, increasing in velocity between 12 and 2:30 o'clock, as claimed by the parties, respectively, to from 36 to 50 miles an hour. At 2:30, as claimed by the West Cherow, and 2:40, as claimed by the Pendrecht, the vessels came into collision; the port quarter of the West Cherow striking the starboard side of the Pendrecht slightly forward of amidship.

The West Cherow insists that she was in all respects free from fault for the collision, and that the same was caused by the failure of the Pendrecht to allow her sufficient berth room at the time of her anchorage. The Pendrecht, on the other hand, claims that ample berth room was allowed the West Cherow, and that the collision resulted from the dragging of the anchor of the West Cherow, caused by the high wind upon her exposed freeboard, and her failure to exercise proper maritime caution and skill in the navigation of the ship, by not letting out anchor chain, or moving up on her anchor, either of which, as claimed by the Pendrecht, would have averted the disaster.

This brief summary of the facts gives the issues between the parties, the correct determination of which will settle the dispute between them. It will readily be seen that the collision must have been brought about in one of the three ways indicated, as there was nothing in the prevailing conditions to have caused the ships to come together. These causes will be considered in the order named.

First. Did the Pendrecht foul the berth of the West Cherow upon coming to anchor? This is the primary question to be considered, because, if it did, that of itself would constitute fault on the part of the Pendrecht. The court has given full consideration to this feature of the case, and its conclusion is that, in the circumstances of this collision, an insufficient anchorage space was allowed the West Cherow by the Pendrecht, when the latter came to anchor. There was no excuse for the failure of the Pendrecht to allow ample berth room to the ship at anchor. It was in a roadstead, miles of deep water all round, and the anchorage in no way crowded. It is true the space allowed of 300 to 400 feet was sufficient, so long as the two vessels

swung the same way; but it was manifest to the Pendrecht that the West Cherow was light, riding high out of the water, some 40 feet, as the court recalls, from the water to the top of its superstructure. The Pendrecht, by reason of her construction, was low down in the water, and it was evident, in case of a storm arising, that the more exposed vessel would likely be influenced by the force of the wind; whereas, the less exposed vessel would be influenced by the tide. This, it seems to the court, is just what did occur, and was the primary cause of this collision, and ought to have been foreseen by any intelligent mariner. Anchorages that do not allow for a double swing of ships at anchor necessarily present the impending peril of one being driven by the wind, and the other swept by the tide. While in many instances, by reason of lack of space, such an anchorage might be justified, no such necessity existed here, and navigators likely to be affected by the insufficient berth room should have been admonished at all times to be upon guard to escape almost certain disaster, if the wind and tide conditions indicated, arose. The Juniata—The Sovereign of the Seas (D. C.) 124 Fed. 861, and cases cited; The Jason—The Hesperos (D. C.) 257 Fed. 438, 441.

Second. Considering the evidence introduced by the Pendrecht, that the West Cherow dragged her anchor, which was the sole cause of the collision, the court has given much consideration to the same. The testimony is squarely in conflict; those on the West Cherow scouting the suggestion that their anchor dragged, and those on the Pendrecht affirming that it did. This question must be solved in the light of all the evidence, and after viewing the testimony from every standpoint, and in the light of the circumstances of the collision, the court is convinced that there was no dragging of the anchor of the West Cherow. There was nothing in the surroundings to cause it to drag. The anchorage ground was of the best; the anchor strong and powerful, and her anchor chain of sufficient length; and there were no weather conditions that would have caused the anchor to drag. The navigators and crew of the Pendrecht, it is true, testified positively that the dragging occurred; but the facts as to the positions of the several members of the crew, their opportunities of knowledge, the fact that at the time most of them were engaged in employment incident to coaling their ship, the explanation they make as to how and why they observed the dragging, coupled with the mystery of the writing of the ship's log, and the failure to produce the rough log alleged to have been made at the time of the collision, one and all tend to discredit, rather than support, the dragging theory. The positions the vessels occupied quickly after the collision, and as they straightened out, likewise tend to refute the suggestion. Moreover, the Pendrecht, being clearly at fault in her original anchorage, should not be heard to rely on suggested faults of the ship imperiled by her conduct, in the absence of clear proof to the contrary.

Third. Coming now to the further defense of the Pendrecht, to the effect that the West Cherow failed to exercise proper maritime skill to avoid collision, by dropping another anchor, or by paying out or heaving in on her chain, or by operating her engines or otherwise,

as she might have done under the circumstances, the court's conclusion is that there is much force in some of these suggestions, especially that of the failure of the West Cherow to take timely action to avert the collision after the same became imminent, namely, that as the result of the wind she had become windrode, and the Pendrecht, lying low in the water, had become tiderode. For nearly 24 hours, these two vessels had remained in the positions they were in just preceding the collision. The masters of both vessels were charged with knowledge of the fact that the distance between the ships was only a safe anchorage so long as both vessels swung the same way. The West Cherow was a large ship, and high out of the water. Her navigators knew, or were charged with knowledge, that upon the coming of a considerable storm their ship would be affected more by the wind than the tide, if those forces were in opposite directions. The wind came at 12 o'clock. It was not very strong, it is true. It was not such a storm as swept the ship high out of the water, over one affected by the tide, but it was of sufficient velocity as that by 2 o'clock the West Cherow says she was held in the wind, and her bow forced from south-southwest to south. The collision occurred, according to the West Cherow, at 2:30, and 2:40 as claimed by the Pendrecht. The West Cherow had been admonished for 2½ hours of her possible dangerous condition, and from 2 o'clock, 30 minutes at least before the collision, of the actual danger, namely, from the time she admits being held in the wind against the tide. During this last 30 minutes, and from 1 o'clock on, as claimed by the first engineer of the West Cherow, he was, because of the exposed condition of the anchorage, continuously on watch, with 175 pounds of steam up to the throttle on three boilers (200 pounds being carried at sea), with the condenser in operation, the pump running with sufficient vacuum, and with steam on the winches. At 2:20 he was ordered to stand by, and he insists that, notwithstanding the steam on the three boilers as above stated, he could not have turned his engines over for 15 minutes, that is, until 2:35, and he did not, and was never ordered to, turn them over certainly until after the collision. He also claims that, after receiving the order to stand by at 2:20, it would have been unsafe or not desirable to turn his engines over, had he been ordered so to do, for possibly 15 minutes; that that time would be consumed, approximately, in warming up his engines, and thereby avoid stripping the blading of the seals.

This entire position respecting the handling of the engines on the occasion in question convinces the court that there was negligence on the part of the West Cherow's navigators in directing the working of her engines. At 1 o'clock, with steam on three engines, and in the condition described above, good seamanship required that her engines should have been so kept as to have responded immediately to orders to move the ship, and it was gross negligence after the ship became held in the wind, as the West Cherow claims, at 2 o'clock, to have remained 20 minutes before giving the order to stand by, so that the ship could be promptly moved in an emergency; and the failure then, and until after the collision, to give timely orders to turn the engines over,

was inexcusable. On the West Cherow's own showing, had the stand by order been given at 2 o'clock, when the ship was admittedly held in the wind, in 15 minutes the anchor could have been picked up, and the ship moved 15 minutes before the collision, and 25 minutes if the collision occurred at 2:40, instead of 2:30. Moreover, the court is not inclined to accept the view of this engineer, that in an emergency, under the conditions in which the engines were from 1 o'clock on, it would have required 15 minutes to turn his engines over. He thinks that a fair and reasonable time in which to move them, and says it was not advisable to turn them over in less time; but in the perilous condition in which the ships were then placed, this conservative statement of what the engineer might have done should not avail, as he could at least have taken some chance, possibly even slightly injuring his vessel, in order to escape a catastrophe that would naturally follow from the tardiness with which orders to move the ship were given. Entirely regardless of what this engineer did in the emergency in which he was placed, and he seems to have received no orders except to stand by, there can be no excuse for the failure of the West Cherow, with a full head of steam on three boilers, and everything in condition to promptly direct the ship's movements, to pick up her anchor, and thereby have avoided risk of collision. This action on her part should visit upon her partial responsibility for bringing about the collision, and hence to share the damages with the Pendrecht.

[2] Fourth. An interesting legal question has been presented in this case by the Pendrecht, namely, that an action in rem cannot be maintained, because the collision occurred in Portuguese waters, and there is no law of Portugal whereby damages for a tort sustained in collision can be recovered in in rem proceedings.

The court's conclusion upon this legal question is that an action in rem in an admiralty court of the United States, between a ship belonging to the United States, and a Dutch ship found within the United States, for a maritime tort occurring in one of the public navigable waters of Portugal, in an open sea and roadstead, largely used in world commerce, can and should be maintained, and that there is nothing in the law of Portugal, or its rules and regulations, with respect to the enforcement of maritime causes of action, that militates against this court exercising its full jurisdiction in the premises. It may be true, under the laws of Portugal, that a proceeding in rem against the res is not specifically provided for in its admiralty courts in that country, designated "courts of commerce," as prevails among maritime nations generally; yet the right to a lien, or rather to reach and hold liable the vessel itself, for maritime torts arising from collision, such as is recognized by the maritime law common to all civilized nations, is apparently acknowledged. The fact that the enforcement of this right to specifically reach the res involved in cases of collision has to be preceded by proceedings in personam, against the ship's master or owner, while the vessel is in her territorial waters, or can be made effective by "embargo" laid upon the ship after proof of fault has been offered, is not material, so far as the right of this

court to entertain this action in the present circumstances is concern-- ed. To deny the right of a court of admiralty to entertain an action in rem in a case like the present would be to enable the ship, as such, to escape liability entirely for its torts, merely because it had fled from the jurisdiction of the Portuguese tribunals, where it might be impracticable, and indeed ineffective, to lay an "embargo" upon the res, or to proceed in personam against her master or owners; and that, too, when by the laws of that country the collision liability is recognized for a maritime tort, its enforcement only being delayed, as hereinbefore indicated.

The following authorities will be found generally to sustain the views herein stated: The Eagle, 8 Wall. 15, 20, 21, 19 L. Ed. 365; The Diana, 1 Lush. 539; The Courier, 1 Lush. 541; The Griefswald, Swabe, 430; The City of Mecca, 4 Asp. Maritime Cases, 412; Raikes Translation of the Maritime Code of Portugal, pp. 134 and 189; The Avon, Fed. Cas. No. 680; The Champion, Fed. Cas. Nos. 2,583, 2,584; The Kongsli (D. C.) 252 Fed. 267, 272.

Counsel for the respondent referred to quite an array of authority in support of their contention that this action could not be maintained, which have been fully considered, and do not seem to change or modi- fy the views herein expressed, under the facts and circumstances of the present case. They refer to the class of cases of which The Cuzco (D. C.) 225 Fed. 169, and Smith v. Condry, 1 How. 29, 11 L. Ed. 35, are samples. But in those cases no lien liability of any sort existed against the ship for the cause of action involved. The Smith v. Condry case was decided upon the assumption that the collision was caused by the act of a compulsory pilot, for whose acts, under the local law, all liability was denied.

The court's conclusion upon the whole case is that it has jurisdiction, and that the collision occurred as the result of the joint negligence of the two vessels in collision, and a decree so declaring will be enter- ed on presentation.