ELDER DEMPSTER SHIPPING CO., Limited, v. POUPPIRT.

(Circuit Court of Appeals, Fourth Circuit. November 5, 1903.)

No. 495.

1. ADMIRALTY JURISDICTION—TORTS COMMITTED ON HIGH SEAS—FOREIGN SHIPS.

A court of admiralty of the United States has jurisdiction of an action in personam against the owner of a foreign ship to recover for injuries sustained by an American passenger on the high seas, irrespective of the law of the ship's flag, the case being governed by the general maritime law as administered in this country.

2. SHIPPING—CARRIERS OF PASSENGERS—LIABILITY FOR INJURIES.

A ship is not bound to the same strict responsibility for the safety of passengers as in the case of goods, but is bound to exercise a high degree of care, while the passenger is also required to exercise reasonable care for his own safety.

3. SAME—ASSUMPTION OF RISK BY PASSENGER—UNNECESSARY EXPOSURE TO DANGER.

A passenger who voluntarily leaves a place of safety on a ship without necessity, and goes to a part of the ship where there is danger, of which he has knowledge, or which is obvious, assumes the increased risk therefrom, and he cannot recover from the ship or its owners for an injury so received because he was not given warning, which, under such circumstances, was unnecessary.

4. SAME—EVIDENCE CONSIDERED.

Libelant was one of three passengers on a freight vessel on which he had been for some three months. Before making port on the return voyage, the crew were engaged in tearing down a temporary structure built on the deck for the housing of cattle on the outward voyage and throwing the timbers over the side. After being on the bridge with the other passengers watching the work for the greater part of a day,

libelant toward evening went upon the deck and stood near the rail where the men were at work, and while there he was struck and injured by a long timber which had been shoved over the rail endwise in the usual manner until it overbalanced, the motion of the ship causing the upper end to swing forward when the other end struck the water *Held*, that the proximate cause of the injury was the act of libelant himself in going without necessity to a place of danger, and that the officers of the ship were guilty of no negligence which rendered the owners liable therefor.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk.

For opinion below, see 122 Fed. 983.

H. H. Little (Robert M. Hughes, on the brief), for appellant.

Floyd Hughes (F. M. Whitehurst, on the brief), for appellee.

Before SIMONTON, Circuit Judge, and MORRIS and KELLER, District Judges.

SIMONTON, Circuit Judge. This case comes up on appeal from the District Court of the United States for the Eastern District of Virginia, sitting in admiralty. Frank A. Pouppirt filed his libel in personam in the court below against the Elder Dempster Shipping Company, Limited, of African House, a corporation created under the laws of Great Britain and Ireland, on the 21st February, 1902. The defendant, being a foreign corporation, could not be found nor served with process within the district. An attachment was issued out of the said court on the same day, under which the British steamship Montenegro was attached and taken into custody by the marshal as the property of said respondent. The vessel was released on bond. Prior to this a libel in rem had been filed against the steamship Montenegro by the same libelant for the same cause of action, and the steamship released on a similar bond, under a stipulation that, if the defendant and its sureties are held liable on the bond taken in attachment, they will not be held liable on the bond taken upon the libel in rem. The respondent has answered the libel in personam, and, after excepting to the jurisdiction of the court, traversed the main allegations of the libel.

The steamship Montenegro was chartered by the respondent, her owner, to take a cargo of mules from the port of New Orleans to a port in South Africa. The libelant was engaged to go on the steamer as a veterinary surgeon by the British government, and went on the said steamer as a passenger, his expenses to be paid at Cape Town, South Africa, and from port of arrival, on his return to the United States, to Denver, Colo. The ship took the cargo of mules to South Africa, delivered them, and started on her voyage to New Orleans for another cargo. When she reached the mouth of the Mississippi she was met by a telegram instructing her to go to Galveston for a cargo of cotton. She at once, greatly to the disgust and against the protest of libelant and two others, also veterinary surgeons, on the ship, set out for Galveston, libelant and his companions having in vain sought the means of going ashore at Port Eads, at the mouth of the Mississippi. In order safely to transport the mules, the vessel had had stalls and other fixtures set up in her hold

and on the main deck. The structure on the main deck extended from the bridge to the forecastle, and was covered over with a good roof; this roof, in effect, making another deck extending from the bridge forward. The timbers used in the construction of this structure were many of them long and heavy. On the roof of this structure the passengers and officers of the ship could take exercise, and frequently used it for this purpose. When he was on this voyage to Galveston under his new instructions, the master of the Montenegro began to prepare his ship for a cargo of cotton. To this end he employed his crew and a gang of muleteers, who having gone with the mules to South Africa, were now returning. These tore down the partitions and stalls in the hold and dismantled the structure on the deck. This work of demolition began on the day after leaving Port Eads; that is, 13th November, 1901, and was continued all the next day. Two gangs were employed, one under the mate on the starboard side of the ship, and the other under the boatswain on the port side. The smaller pieces, as they were disengaged, were sent over the side of the ship in a basket. The steam winch of the ship was used for this purpose. The longer and larger beams, after being disengaged from their fastenings, were lifted by the workmen and placed on the rail of the ship and shoved along until the weight of the part over the rail counterbalanced that on the ship. They were then let go, striking the water and falling overboard. As the vessel was moving through the water at the rate of eight or ten knots, the ends of the beams, being shoved overboard, when they struck the water, were driven aft, and that portion of the beams resting on the rail, which acted as a sort of pivot, were necessarily driven forward. Of course, there was great danger during this operation to every one on the main deck in proximity to the beams which were being put overboard. During the morning of the day on which the working parties were thus dismantling the ship, the libelant and his companions were on the bridge, watching the operation with interest. They saw very many beams disposed of as above described, and very great progress was made in the work. The libelant and the other doctors lived in the cabin at the stern of the ship occupied by the officers. During the afternoon the libelant, after afternoon tea, went down upon the main deck where this work was being performed. A very short time afterwards, whilst he was on that deck in proximity to a large beam, which was in the act of being discharged over the side of the ship, he was struck a violent blow on the head by that part of the beam still over the ship, the other end having struck the water. The lower end of the beam having been suddenly drawn aft, the upper end of the beam was canted forward. There is conflict in the testimony upon two principal points. The libelant denies that he was warned either against going on the deck or whilst upon the deck. He heard a cry immediately before he was struck, which he did not understand. Witnesses for respondent say that whenever a beam was thrown in this way overboard, the general warning had been given by the crew of "Look out!" and also that the libelant had been specially warned about going on the main deck where the men were at work. An-

other point of contradiction is·as to the place in which he was stand-
ing when the blow came.   On his behalf it is said that he was on the
deck four or five feet from the rail, looking at the ship.   The wit-
nesses for the respondent say that when he was on the deck he ran
to the rail whilst the beam was being shoved over it, and watched it
as it fell in the water.   Whilst he was leaning over the rail and look-
ing down, the beam slid on the rail and struck him.   The court be-
low heard the case upon testimony taken before him and by deposi-
tion, gave a decree for the libelant, and fixed his damages at $12,000.
An appeal was allowed, and the case comes up on many assign-
ments of error.   The first two of these are error in entertaining ju-
risdiction of the case and error in not holding that the action is gov-
erned by the law of Great Britain, and that therefore libelant had
no right of action in admiralty.   The other assignments of error go
to the merits; error in holding that respondent was guilty of negli-
gence; error in holding respondent for damages; error in grant-
ing excessive damages; error in admitting the libelant to say that,
if he had been warned not to go to the scene forward by the captain,
he would have obeyed him, but that in fact he had no such warning.

### As to the Jurisdiction.

The respondent insists, as the cause of action in this libel orig-
inated on the high seas, on a British ship flying the British flag, it
must be treated as if it occurred on British soil, solely within the
jurisdiction of the British courts.   The appellant admits that many
decided cases sustain the general jurisdiction of our courts in ad-
miralty over cases of tort arising on the high seas on vessels of other
nationality than ours.   But he insists that these are cases of colli-
sion where the tort did not occur wholly on either ship, or contracts
of carriage, or for seamen's wages; all of which are communis juris,
and are cognizable by courts of admiralty of all nations.   It must
be borne in mind that the libelant is a citizen of this country, under
his contract to be restored to the country.   The Supreme Court of
the United States has established the doctrine that the courts of ad-
miralty of this country can, in their discretion, take jurisdiction of
cases of tort occurring on the high seas between subjects or citizens
of foreign states; that, if they decline to exercise such jurisdiction,
it is not for a want of authority to do so, but because they deem it
expedient, under the circumstances of the particular case, to do so.
Take a case of foreign seamen suing because of ill treatment.   In
such cases the consent of their consul or minister is frequently re-
quired before the court will proceed to entertain jurisdiction, not
on the ground that it has not jurisdiction, but that, from motives of
convenience or international comity, it will use its discretion whether
to exercise jurisdiction or not.   And where the voyage is ended, or·
the seamen have been dismissed, or treated with great cruelty, it will
entertain jurisdiction even against the protest of the consul.   The
Belgenland, 114 U. S. 363, 364, 5 Sup. Ct. 864, 29 L. Ed. 152.   See,
also, for a full discussion of the law Deady, J., in Bernhard v. Creene
et al., 3 Sawyer, 230, Fed. Cas. No. 1,349.   If this be the law as to
actions by foreigners against foreigners, a fortiori it is the law aﬆ

between an American citizen and a foreigner. The language of Dr. Lushington in The Johann Friederich, 1 W. Rob. 35, quoted in The Belgenland, supra, is proper here:

"If these parties must wait until the vessel that has done the injury return to its own country, their remedy might be lost altogether, because she might never return; and, if she did, there is no part of the world to which they might not be sent for redress."

Our admiralty courts certainly take jurisdiction of collisions on the high seas occurring between vessels of different nationalities both foreign to this country. This not for the reason that in cases of collision a tort did not occur wholly on either ship. In this very case of The Belgenland, the ship only was found guilty of tort in colliding with a Norwegian vessel, and she was made to pay heavy damages. Judge Brown, of New York, than whom there is no better authority in admiralty, in The Brantford City (D. C.) 29 Fed. 383, quotes from The Belgenland the following:

"As to the law which should be applied in cases between parties or ships of different nationalities arising on the high seas, not within the jurisdiction of any nation, there can be no doubt that it must be the general maritime law, as understood and administered in the courts of the country in which the litigation is prosecuted."

To this he adds:

"The fact that in most of the cases cited the injury arose from collision is immaterial. The gravamen of the action is negligence. On that alone the action depends. It is the negligence only that constitutes the tort."

We concur fully in the conclusion of the District Court that jurisdiction can be taken in this case.

## On the Merits.

Assuming that the libelant occupied the position of a passenger in this steamship, and that as to him the ship was a common carrier, what was the responsibility of the shipowner to him? In Boyce v. Anderson, 2 Pet. 150, 7 L. Ed. 379, Chief Justice Marshall, after stating the doctrine of the common law that a carrier is responsible for every loss which is not produced by inevitable accident, says that this doctrine cannot be applied in the case of passengers, living beings, over whom the carrier cannot have the same control as he has over inanimate matter. He applies this modification of the doctrine to the carriage of slaves, and says that in that case the carrier was only liable for ordinary neglect, that being the law with respect to the carriage of passengers. The same distinction was observed and applied in a similar case of McDonald v. Clark, 4 McCord, 223, and in the Alabama case, Williams v. Taylor, 4 Port. 238. In Chicago, etc., Ry. Co. v. Zernecke, 183 U. S. 587, 22 Sup. Ct. 231, 46 L. Ed. 339, the Supreme Court of the United States, discussing the general law on this subject, says:

"It seemed to the able judges who decided Coggs v. Bernard [2 Ld. Raym. 909], that on account of the conditions which then surrounded common carriers public policy required responsibility on their part for all injuries and losses which occurred from the acts of God or public enemies, and many years afterwards Chancellor Kent praised the decision of cases which de-

clined to relax the rule to excuse carriers for losses by fire. That rule was not and has not been extended by the courts to passengers, and Chief Justice Marshall, in speaking for this court in Boyce v. Anderson, 2 Pet. 150, 7 L. Ed. 379, refused to apply the rules to slaves, saying: 'The law applicable to common carriers is one of great rigor. Though to the extent to which it has been carried, and in the cases in which it has been applied, we admit its necessity and its policy, we do not think it ought to be carried further, or applied to new cases. We think it has not been applied to living men, and that it ought not to be applied to them.' "

In Stokes v. Saltonstall, 13 Pet. 191, 10 L. Ed. 115, the Supreme Court says:

"It is certainly a sound principle that a contract to carry passengers differs from a contract to carry goods. For the goods the carrier is answerable at all events, except the acts of God and public enemies. But, although he does not warrant the safety of the passengers at all events, yet his undertaking and liability as to them go to this extent: that he, as agent, as in this case he acted by an agent, shall possess competent skill, and that, so far as human care and foresight can go, he will transport them safely."

This case quotes 2 Kent, Comm. (14th Ed.) p. 600:

"The proprietors of a stage coach do not warrant the safety of passengers in the character of common carriers, and they are not responsible for mere accidents to the persons of passengers, but only for want of care."

This same principle is illustrated in the common law. A carrier may be responsible for negligence, but, if the passenger be also negligent, and his negligence is the proximate cause of the injury, the carrier cannot be held. The court below, in dealing with this subject, says:

"In determining the question of fault in bringing about the misfortune, nothing need be said as to the degree of care required of the respondent ship, as a carrier of passengers. The law in this regard is too well settled to need special comment at this day further than to say that the highest degree of care and caution is required, and that the presumption of negligence is against the carrier where injury is sustained by a passenger."

It seems to us that the learned judge states this proposition too broadly, and that his doctrine is inconsistent with the opinion of Chief Justice Marshall in Boyce v. Anderson. For the proposition thus stated by him the learned judge below quotes The New World, 16 How. 469, 14 L. Ed. 1019. In that case the passenger was injured by the explosion of a boiler on a steamboat racing with another on the Mississippi river. The case was held to come within and to be decided by the thirteenth section of the act of July 7, 1838 (5 Stat. 306), as follows:

"In all suits and actions against proprietors of steamboats for injury arising to persons or property from the bursting of the boiler of any steamboat, or the collapse of a flue or other dangerous escape of steam, the fact of such bursting, collapse or injurious escape of steam shall be taken as full prima facie evidence sufficient to charge the defendant or those in his employ with negligence, until he shall show that no negligence has been committed by him or those in his employ."

The other case quoted by him is The City of Panama, 101 U. S. 462, 25 L. Ed. 1061. In that case the court says:

"Owners of vessels engaged in carrying passengers assume obligations somewhat different from those whose vessels are employed as common carriers of merchandise. Obligations of the kind in the former case are in some

few respects less extensive and more qualified than in the latter, as the owners of the vessel carrying passengers are not insurers of the lives of their passengers, nor even of their safety, but in most other respects the obligations assumed are equally comprehensive and even more stringent."

In Simmons v. New Bedford, etc., Steamboat Co., 97 Mass. 367, 93 Am. Dec. 99, the court stated the law thus:

"A carrier of passengers for hire is not, like a common carrier of goods, an insurer against everything but the act of God and public enemies. He is not held to take every possible precaution against danger, for to require that would make him an insurer to the same extent as the carrier of goods, and might oblige him to adopt a course of conduct inconsistent with economy and speed essential to the proper disposal of his business. But he is bound to use the utmost care which is consistent with the nature of and extent of the business in which he is engaged, in the providing of safe, sufficient, and suitable vehicles or vessels and other necessary and appropriate means of transportation, as well as in the management of the same, and he making such reasonable arrangements as a prudent man would make to guard against all dangers from whatever source arising which may naturally and according to the usual course of things be expected to occur."

In Ingalls v. Bills, 9 Metc. (Mass.) 7, 43 Am. Dec. 346, the court, after stating the law with regard to carriers of goods, says:

"But in regard to the carriage of passengers the same principles of law have not been applied, and for the obvious reason that a great distinction exists between persons and goods; the passengers being able to take care of themselves and of exercising that vigilance and foresight in the maintenance of their rights which the owners of goods cannot do, who have intrusted them to others."

So, also, in Tood v. Railway Co., 7 Allen, 207, 83 Am. Dec. 679:

"If passengers voluntarily take exposed positions with no occasion therefor, and no inducement thereto caused by the managers of the road, except a bare license by noninterference, or express permission of the conductor, they take the special risk of the position on themselves."

And in Hickey v. Railway Co., 14 Allen, 429:

"It is equally the duty of the passenger to avoid all unnecessary risks."

See, also, our own case of Kimball v. Palmer, 80 Fed. 240, 25 C. C. A. 394, to the same effect; and in the same volume, Chicago, etc., Railway Co. v. Myers, 80 Fed. 361, 25 C. C. A. 486. In this last case it is said:

"If a passenger of mature age leaves the place which he knows has been provided for him, and, without any occasion for so doing, or to gratify his curiosity, goes to another, where the dangers are greater, or places himself in a dangerous attitude, which he was not intended to assume, or if he disobeys any reasonable regulation of the carrier, it should be held that he assumes whatever increased risk of injury is incurred in so doing."

Keeping in mind this qualification of the broad language of his honor the District Judge, let us examine the undisputed facts in this record. In all the disputed facts we recognize the force and value of his conclusions. The libelant, a man of more than ordinary intelligence and education, watched for some hours the operation of dismantling the structures on the ship. He saw and understood the method used in throwing overboard the larger pieces of timber, and saw that when they struck the water the end in the water went aft, and the end on the vessel canted forward on the rail. As he had full

opportunity of seeing all this from his position on the bridge, he must have seen the precautions which the men at work took when the timber was pushed over the rail into the water. He must also have seen and fully realized the danger attending these operations. He was in a place of perfect safety on the bridge, and as the work was proceeding rapidly he could easily realize that the necessity for him to remain in this place of safety would soon cease. He was not confined on the bridge. He could move about upon it and take a moderate degree of exercise on it. The bridge was seven or eight feet wide and the whole width of the ship in length. After observing for nearly a whole day what was done and how it was done by the men at work, he left the bridge, and went down to the scene of operations. On both sides of the deck gangs of men were tearing down and moving parts of the structures and putting them overboard. He went in close proximity to them. If he did not closely observe them, and keep his attention alive so as to take precautions when threatened with danger, it was his own neglect for not doing so. The gangs of men were at the same work which he had seen them at all that day. Why did he go there? He knew that on the bridge he was safe. He could not avoid knowing that on the Montenegro, where the work was going on, he was in more or less danger. There certainly was no necessity for him to go down upon this deck. He did it voluntarily. If he went there from curiosity, or to take exercise, or from any other motive, he was using his right as a reasonable being, but at the same time he assumed the risk. He could only have been prevented from doing that which he did by being shown the danger, which was unnecessary, as he could himself see it without being told, or by being forcibly arrested, carried back to the cabin, and confined there—a doubtful proceeding with regard to one not one of the crew. This was not a passenger ship, but a freight ship, on which the libelant had gone from New Orleans to South Africa in charge of the cargo of mules, and he was returning on her with full knowledge that the business for which she was intended was carrying freight. The work which was going on to remove the temporary fittings no longer needed was necessary and proper work on a freight steamer, and there was no concealed danger connected with it. The libelant was not an inexperienced landsman freshly come aboard, but had lived aboard the ship for over three months. He had been watching the work for hours, and must have understood the danger as well as those engaged on it. There were only three passengers, and they were quite naturally allowed greater freedom of action than would be allowed on an ordinary passenger ship. Can it be said that under these peculiar and unusual circumstances the shipowner owed a duty to the libelant to warn him of that which he already knew, and to station a man to pull him out of a danger from which he, of his own prudence, should have retreated? Unless there was a duty there was no negligence, and unless there was negligence there can be no recovery. The fact that the beam, one end of which was in the water down at least 23 feet below the top of the rail, struck the libelant at all supports the testimony of the master, the ship's doctor, the boatswain, and one of the sailors that the libelant was near the rail, and that he had come from the middle

of the deck to the rail to look and see what would happen when the beam struck the water.

We are constrained to reach a conclusion different from that of the court below. In our opinion, the proximate cause of the injury was the act of the libelant himself. He was in a place in which he had no occasion to be, certainly no necessity for being. He suffered the consequence of his own act.

The decree of the court below is reversed, and the case is remanded to that court with instructions to enter a decree dismissing the libel, with costs. Reversed.

### On Petition for Rehearing.

(November 20, 1903.)

PER CURIAM. This case was ably and exhaustively argued before us, and has received careful attention. We have examined the petition of the appellee for a rehearing, which has been presented, and see no reason for reconsidering our conclusion. The prayer of the petition is denied.

Libelant's application for a writ of certiorari from the Supreme Court denied.