## THE TOURIST.

(District Court, D. Maine. May 3, 1920.)

No. 547.

**1. Shipping ⬿166(1)—Steamer at fault in injuries to passenger caused by swinging of gang plank.**

Where a steamer passenger, sitting near the gangplank, had his leg broken by the swinging of the plank, due to the motion of the steamer when the captain swung the wheel preparatory to leaving a landing, the steamer *held* at fault, in that a deck hand, after calling, "All right!" and a few seconds later, "Hold her!" shoved out the gangplank to the wharf, without waiting to see whether the captain understood the last signal.

**2. Shipping ⬿166(1)—Persons in charge of passenger steamer bound to exercise utmost care.**

Those in charge of a passenger steamer are not insurers of the safety of the passengers, but are bound to use the utmost care consistent with the nature and extent of the business in which they are engaged, in providing a reasonably safe steamer, and in its management.

**3. Shipping ⬿166(3)—Carrier entitled to assume passenger will exercise care.**

Carriers of passengers by sea have a right to assume that passengers will exercise the care of reasonably prudent men.

**4. Shipping ⬿166(3)—Passenger, struck by gangplank, held at fault in not getting out of way.**

A steamship passenger, sitting on a bench near the gangplank, who at several landings had received a general warning to look out for the gangplank, and who might have seen that his feet were within the reach of the gangplank, if it should swing to the fullest possible extent, and must have seen the exposed character of a landing, *held* at fault in failing to get out of the way before his leg was struck by the swinging of the gangplank.

**5. Shipping ⬿166(3)—Passenger, struck by gangplank, held not to assume risk, or guilty of inexcusable fault.**

A steamship passenger, sitting on a bench near the gangplank, who heard no specific warning that he was sitting in a dangerous place, though warned generally to look out for the gangplank, did not assume the risk of injury from the plank swinging against his leg, and was not guilty of willful, gross, and inexcusable fault.

**6. Negligence ⬿97—Steamer liable for part of injured passenger's damages, if passenger's fault not inexcusable.**

The public good is best promoted by holding vessels liable to bear some part of the actual pecuniary loss to an injured passenger, where their fault is clear, and the passenger's fault is neither willful, gross, nor inexcusable.

**7. Damages ⬿131(2)—Negligence ⬿101—Injured steamship passenger's damages held $1,400, of which steamer should bear one-half.**

Where a steamship passenger sustained a Potts' fracture of the leg when struck by the swinging of the gangplank, and he was 57 years old and not in perfect health, and 5 months after the injury was able to work to a certain extent, and at the end of a year would have what the doctors called a functional foot and be able to work, $1,400 *held* full damages, of which the steamer should bear one-half, where both were at fault.

In Admiralty. Libel by James L. McCarrick against the steamer Tourist and Oscar C. Randall. Decree for the libelant.

⬿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

James H. McCann, of Portland, Me., for libelant.

Frederic J. Laughlin and Nathan W. Thompson, both of Portland, Me., for libelee.

HALE, District Judge. On July 30, 1919, the libelant was a passenger on the respondent steamer on a passage from Portland to the Gurnet in Casco Bay. Accompanied by his wife, he boarded the steamer at Forest City Landing, Peaks Island, and took his seat on the stationary bench running from the after side of the gangway on the port side; soon after starting he changed seats with his wife, and sat at the end of the seat nearest to the gangway, his wife sitting next to him; he retained this position until the time of the injury. The steamer is of the burden of 33 tons gross, about 56 feet long, 16 feet beam, 5 feet depth of hold, and 150 horse power. She is said to be capable of carrying at least 231 passengers. She was under the control of her captain, Oscar C. Randall, who held a license. He also carried a licensed engineer, two deck hands, and a purser, making a total of 5 men. On the trip in question there were 127 passengers aboard.

The seat on which the libelant was sitting at the time of the injury was cut off at an angle, so that the inboard part of the seat was 11 to 12 inches aft of the forward and outward part; under the inboard corner, as the seat was cut off, was a stanchion, or post, to support the seat. Upon the steamer's arrival at South Harpswell, the libelant was sitting, as I have described, when, as the steamer was leaving the wharf, the gangplank, the end of which was out on the wharf, swung and caught the libelant's left leg between it and the stanchion, causing an injury for which this action is brought.

[1] The proofs show that, when the steamer reached South Harpswell, a deck hand by the name of Rutherford was "handling the upper deck." Capt. Randall was in the pilot house, about 20 feet from the deck hand. The plank was put out; one passenger crossed it and landed upon the wharf, whereupon Rutherford pulled in the plank and shouted, "All right!" The captain states that he then swung the wheel to starboard, thereby causing the stern to swing off and making some motion of the boat. It appears that the wharf lines were still out. At about this time Rutherford found that two ladies on the deck wanted to get off, whereupon he shouted, "Hold her!" at the same time shoving the gangplank out again onto the wharf. The time, I think, is fixed as nearly as possible as about 15 seconds between the two signals, "All right!" and "Hold her!" but, of course, it is impossible, under such circumstances, to be exact about time. Rutherford did not wait to see whether the Captain had heard his signal to hold her, nor to see whether the boat was moving, but at the same time when he shouted, "Hold her!" he threw the end of the gangplank upon the wharf.

The proofs tend to show that, when Rutherford shoved the gangplank out, the boat was in some motion; the gangplank at once began to swing. The boat was yawing, one end of the gangplank resting on the wharf, and the other on the deck of the boat. The gangplank

swung toward Rutherford, who stood alongside the libelant, between him and it. Rutherford jumped over the plank, shouting "Look out!" The libelant had remained in his position, and had drawn his feet in under the seat, with one leg forward of the stanchion. The gangplank continued its swing toward the libelant, pinning the libelant's left ankle up against the stanchion and causing a Potts' fracture of the ankle. The leg remained pressed against the stanchion, until the stanchion broke from its fastenings where it was toe-nailed in.

Rutherford says that, when he shouted, "Hold her!" he thought that the captain seemed to be looking at him. Capt. Randall testified:

"Q. If you were looking on the port side, couldn't you see the condition of that plank?

"A. Well, you might, and you might not. There were some people between us and the gangplank; between the gangplank and the pilothouse.

"Q. Well, did you see the condition of that plank, when you looked out?

"A. I saw the condition it was in when he jumped over it.

"Q. That was after the accident happened?

"A. No; at the time of the accident. It was happening. It hadn't happened; it was just happening.

"Q. Well, just before that. Just before the accident happened? Couldn't you see the condition of the plank?

"A. I heard them holler, 'All right!'

"Q. And you thought it was in?

"A. I supposed it was in; naturally would."

The captain was asked by the court:

"Q. You thought the plank was in?

"A. Yes.

"Q. As a matter of fact, don't you know that the plank wasn't in, now?

"A. No; I don't know. There was something happened there. I could not tell exactly. The deck hands were there, and supposed to look out for the plank. I got my word from them."

He says, too, that he heard Rutherford holler, "Hold her!" and, as Rutherford jumped out of the way of the swinging plank, he heard him holler, "Look out!"

Rutherford testifies that it was not a part of his duty to wait and see if Capt. Randall got the signal to hold her—

" * * * Because he was looking at me. We worked as fast as possible.

"Q. Didn't you take a chance that he understood your signal?

"A. Certainly."

From the testimony on the part of the steamer, I must find that the steamer was not free from fault. It seems clear to me that it was the duty of Rutherford, when he shouted, "Hold her!" to make sure that the captain understood him, before he put the end of the gangplank on the wharf. It was an exposed landing, where there was considerable motion of the water, causing a yawing of the boat; any prudent man must have foreseen that, if one end of the gangplank were allowed to rest upon the wharf, when there was a strong movement of the sea, the gangplank must swing violently, thereby causing danger to himself, to the boat, and to the passengers.

[2] There is no need of reciting further testimony. The duty of those in charge of the steamer was clear. Although they were not

insurers of the safety of their passengers, they were bound to use the utmost care, consistent with the nature and extent of the business in which they were engaged, in providing a reasonably safe steamer, and in the management of it. Simmons v. New Bedford, 97 Mass. 367, 393, 93 Am. Dec. 99; City of Panama, 101 U. S. 462, 25 L. Ed. 1061; Elder Dempster Shipping Co. v. Pouppirt, 125 Fed. 732, 737, 60 C. C. A. 500.

Upon all the proofs I must hold that, by a preponderance of the evidence, those in charge of the steamer were not exercising the highest degree of care consistent with their duty. I must hold the steamer at fault, in that Rutherford was not in the exercise of the care of a reasonably prudent man, under all the circumstances of the case, and that his fault contributed to the injury.

[3] Was the libelant also at fault? Carriers of passengers on the sea have a right to assume that passengers will exercise the care of reasonably prudent men.

[4] The libelant sat in a seat where he might have seen that his feet were within the range of the gangplank, if it should swing to the full extent to which it might swing. At the several landings he received a general warning to look out for the gangplank. There is some testimony that he received special warnings, pointing out that his location was dangerous. Whether he had such warnings or not, he must he held to the exercise of his sight and of his common sense, even though he did not fully appreciate his danger. When the landing was made at South Harpswell, he must have seen the exposed character of the landing. In his libel he has alleged that he was "unaware of the danger to his person, and was unaware of the negligence then in effect by the said respondent Randall"; but the proofs do not sustain this allegation. He must have seen Rutherford throw the gangplank over the second time while there was some motion of the boat, and he must have known that the gangplank was liable to swing. He must, in fact, have seen it swing at the time Rutherford saw it swing and jumped. Even at this time he probably might have saved himself by rising and stepping quickly to the right, an act which would have required hardly more time than drawing his feet back under the seat. He says his attention was occupied with the movements of the two ladies who wanted to land, and at whose instance the gangplank was thrown off the second time; that he drew his feet under him to allow them to pass in the narrow passage. There was nothing to prevent him from seeing what was happening directly before him. He clearly had time to get out of the way. The fact that he had not been injured the first time the gangplank was thrown over was no assurance to him that he might not be injured the second time; he must be held to the care of a reasonably prudent man. I cannot find that he was in the exercise of such care. I must hold that the libelant himself was also at fault.

[5] The learned proctors for the claimant contend that the proofs justify and require the finding that the libelant assumed the risk, and thereby relieved the ship of all responsibility. My attention is called to The Scandinavia (D. C.) 156 Fed. 403. In that case the libelant

was injured by using a ladder, one rail of which was broken off at the end; he knowing the condition of the ladder, and he being the only one on the ship who did know its condition. This court held that he assumed the risk. In The Elder Dempster Case, supra, 125 Fed. 732, 739, 60 C. C. A. 500, the libelant left a safe position upon the ship, and went to another part, to watch the operation of dismantling the structures on the ship. He saw the precautions which the men at work took when the timbers were pushed over the rail into the water. He went in close proximity to the point of danger, and put himself voluntarily, and apparently to gratify his curiosity, in a place conspicuously unsafe. The Court of Appeals of the Virginia Circuit held that he assumed the risk, on the ground that he went from a safe place into a place of danger, where there was no necessity of his being, and suffered the consequences of his own act.

After a full examination of the proofs on this point, in the case at bar, I cannot hold that the libelant assumed the risk, and, by his conduct, discharged the ship of all responsibility. He says he heard no specific warning that he was sitting in a dangerous place. While he must have heard the general warning to look out for the gangplank, and while he must have seen the gangplank thrown over, and while he took no precaution, except to bring his feet back under the seat, I do not think he can be held to have known and appreciated all the dangers before him, and to have assumed the risk of such dangers. I cannot go to the extent of holding that he assumed the risk, or that his fault was willful, gross, and inexcusable. In my opinion he presents the instance of a man confronted with a danger, caused by the conduct of the ship, who does not fully appreciate his danger, nor act prudently in view of such danger. He must be held guilty of a concurrent fault, and must have his damages divided.

In the case of personal injuries, as in collision cases, damages are generally divided equally. But the question of any other equitable division is now said to be before the court. In The Max Morris (D. C.) 24 Fed. 860, 864, a case of a stevedore receiving injury on a ship, Judge Addison Brown departed from the ordinary rule of dividing damages equally. He charged to the libelant's own fault all his pain and suffering and all merely consequential damages, and charged the vessel with his wages, thereby following the precedent of The Explorer (D. C.) 20 Fed. 135. In The Lackawanna (D. C.) 151 Fed. 501, Judge Adams, in the Southern district of New York, allowed the libelant to recover but one-third of the damages, citing The Max Morris. The Supreme Court sustained Judge Brown's action in The Max Morris, 137 U. S. 1, 11 Sup. Ct. 29, 34 L. Ed. 586; but left open the question whether any other than an equal division of damages could be recognized.

[6] I do not find any cases reported where the rule has been applied in case of injury to a passenger on a ship. But I can see no reason why it shall not be so applied. In such case the reasoning of Judge Addison Brown is clearly applicable, and the decisions of admiralty courts have sustained his conclusion, that the "public good is clearly best promoted by holding vessels liable to bear some part of the actual

pecuniary loss where their fault is clear, provided that the libelant's fault, 'though evident, is neither willful, nor gross, nor inexcusable.'" In the case before me I find that the libelant was at fault, although his fault does not appear to me to be "willful, gross, nor inexcusable."

[7] What were the damages? Here there is a sharp conflict of testimony. The proofs tend to show that at the time of the injury the libelant was 57 years of age; that he was not in perfect health. He appears to me to show some disposition to exaggerate the seriousness of his injury, and also to exaggerate his earning capacity. As to the amount actually paid out there is no serious dispute. The weight of the evidence tends to show that, at the end of 5 months after the injury, the libelant was able to perform, to a certain extent, the same kind of labor that he was performing before the injury. At the time of the hearing he was clearly able to do work; and the proofs indicate that at the end of a year he would have what the doctors call a "functional foot" and be able to do his work.

In some cases where a Potts' fracture has been sustained, severe results have followed, and large verdicts have been allowed to stand. But this does not excuse the court, in the case at bar, from using great care in seeing what award the proofs justify. Upon a full examination of all the evidence relating to this subject, I fix the full damages at $1,400. I allow the libelant to recover one-half of these damages.

A decree may be entered for the libelant in the sum of $700. The libelant recovers costs.