## THE EMPRESS OF SCOTLAND.

(District Court, S. D. New York. February 3, 1926.)

**1. Shipping ⊜⊸166(3)—Passenger cannot recover for injuries when boarding tender in safe sea for shore visit, where ship's officer did not control his actions and he could see tender was rolling.**

Passenger cannot recover for injuries received when disembarking from ship onto tender for shore visit, where ship's officer did not control his actions when boarding tender, condition of sea was not such as to constitute negligence of officers in permitting passengers to go to shore, and he could see that tender was rolling.

**2. Carriers ⊜⊸325.**

Carriers have right to assume that passengers will exercise care of reasonably prudent man.

**3. Carriers ⊜⊸323—Passenger, receiving injury as consequence of his own carelessness or awkwardness when voluntarily encountering a seen danger, cannot recover.**

Where passenger voluntarily encounters a seen danger, and receives an injury on account of his own carelessless or awkwardness, he cannot recover.

In Admiralty. Libel by John A. McKay against the steamship Empress of Scotland, her boats, boilers, etc. Libel dismissed.

Franc & Becker and Alfred L. Becker, all of New York City, for libelant.

Hardin & Hess and Harold B. Elgar, all of New York City, for claimant.

GODDARD, District Judge. This libel in rem against the steamship Empress of Scotland has been filed to recover $25,000 damages alleged to have been sustained by the libelant, Mr. McKay, as a result of personal injuries which he suffered while a passenger. The Empress of Scotland, a ship of 25,000 tons burden, left New York on February 4, 1922, under charter for "Clark's Tour of the Mediterranean." The itinerary included calls at a number of ports in the Mediterranean, and sight-seeing trips ashore at the various points of interest. The first call, after leaving New York, was Madeira. She then proceeded on to Cadiz, Spain. There, because of lack of docking facilities for a ship of her size, she anchored at the customary anchoring place in Cadiz Bay, and passengers wishing to visit Cadiz were taken ashore in tenders, which were about 100 feet long, and for which arrangements had been previously made by the managers of Clark's Tours.

The Empress of Scotland arrived at Cadiz about 7 o'clock in the morning, and after one tender with passengers had been taken ashore at 8 o'clock, it was announced that further disembarkation for the shore would be deferred until conditions of the sea and tide improved. At 2 p. m., after lunch, the tide had changed, and it was stated by the officers that tenders were available for passengers who desired to go ashore. Upon that announcement, some 200 or 300 passengers congregated on deck, waiting to go ashore, and Mr. McKay joined the line awaiting their turn to board the tender. The tender came alongside the gangway, which had been lowered that morning. This gangway consisted of a stairway about 30 inches wide, with hand railings on either side, and was placed on the port side of the ship, at right angles to the ship. It had a landing at the bottom, which was the same width as the stairway, and variously estimated to be between 3 and 8 feet long. At the top of this stairway stood a seaman; on the landing at the bottom of the stairway was stationed the chief officer, who assisted passengers aboard the tender, and on the tender were two seamen to receive them.

As Mr. McKay stood on deck near the gangway, he saw 50 to 60 people ahead of him pass down the gangway and board the tender; he observed the waves and watched the tender, as it bobbed up and down. He says that the vertical motion of the tender covered a distance of 2½ to 3 feet, and perhaps 4 feet; the chief officer testified 3 feet. The tender was being held in place by ropes, fenders, and poles. Mr. McKay alleges that, before he had gotten aboard the tender, the front part of his left leg, about midway between the ankle and knee, was struck by the gunwale of the tender, which was bound with an iron band. The manner in which he was injured is not clear. He, in his original libel, stated that, while waiting on the landing he was struck. Upon the trial he amended his libel, by alleging that he was struck while MacMurray (first officer) had hold of him, passing him aboard the tender; that MacMurray attempted to lift him right off his feet, and to pass him like a bag of merchandise to the man on the tender—to swing him from the step across.

There is no testimony in the respondent's behalf as to the manner in which the injury was sustained; indeed, it is conceded that the chief officer, who stood on the landing, was not aware that Mr. McKay had been injured, and that it was not brought to his attention until some days afterwards.

Libelant claims that the injuries received developed into a serious condition, and that he was prevented from fully participating in

the benefits of the trip, and from attending to his business for some time after his return, because of the injury; also that it necessitated expense for medical treatment. Libelant contends that the respondent was negligent in the following respects: In allowing disembarkation to take place in a rough sea; that two men, instead of one, should have been placed on the landing to assist passengers; that libelant was injured while in the arms of the chief officer and entirely under his control, who failed to use proper care in passing the libelant over to the tender, and to watch for a favorable opportunity for doing so.

Respondent resists the claim on the ground that, if the libelant was injured, it was due to no negligence on the part of the ship or her officers, but was due solely to the libelant's own carelessness. Of course, if Mr. McKay was injured while in the arms and under the control of the first officer, who failed to use proper care in selecting the time or in the manner of passing him aboard the tender, the liability of the ship is more apparent.

The statements of the libelant as to the manner in which he was injured are contradictory. In his original libel he swears that he was waiting on the landing when struck. He testified on direct examination:

"Q. Were you assisted in getting on to the tender? A. Yes; As I came along, Chief Officer MacMurray said, "Hello, Mr. McKay," and he held out his arms, and he took me and went to pass me to the men on the tender.

"Q. He lifted you off your feet? A. He lifted me from the step.

"Q. He attempted to lift you right off your feet, and pass you like a bag of merchandise to the men on the tender? A. Yes; just swinging from the step across.

"Q. As he did that, did anything happen to you? A. Yes; the tender rose and struck me across the face of my leg.

"Q. Was that while you were still being held by MacMurray, or after he had left loose from you? A. My leg was in the air. * * *

"A. I stepped this way, and when I put my left foot out to get onto the tender, he was swinging me; that's when I was struck."

But at the end of his cross-examination he testified as follows:

"Q. Is it a fact that, when you arrived at the platform at the foot of the gangway, you waited, under instructions then given by the officers and crew of the ship, for directions from them to step from said gangway into said small boat. While so waiting by such platform at the foot of the gangway, you were struck a severe blow on your left leg by the gunwale of the tender. Is that right? A. Yes.

"Q. While you were waiting to get in? A. Well, I understood that as I had described it. I had described to the best of memory as I have the facts, what happened, and there was a little delay in getting aboard; but the tender did not come up on the platform, and it did not come through the platform. * * *

"Q. You did not see what hit you? A. Well, I saw what hit me. I don't think I saw it actually strike me, because I was looking ahead. It was when I drew my leg up this way that it struck me. * * *

"Q. Were you looking at this rail where you were going to step? A. I didn't have it sufficiently in mind.

"Q. You say, as you stood at the edge of that platform, you were standing at the outer edge of the platform, away from the ship? A. Yes. * * *

"Q. In other words, this accident happened while you were stepping yourself from the platform onto the tender; is that right? A. I still was on the platform.

"Q. And you had the use of your limbs, didn't you? A. I do not understand you.

"Q. Nobody was holding your limbs? A. Oh, no.

"Q. And nobody took hold of your limbs in any way? A. No.

"Q. You were not knocked down? A. No."

While it is not shown in the record, Mr. McKay's appearance when on the witness stand indicated that he was a vigorous middle-aged man. It does not seem to me that the condition of the sea at the time was such that it can be held that the ship's officers were negligent under all the circumstances in permitting passengers to go ashore, and it seems to me that, with the chief officer on the landing and the two seamen on the tender, a sufficient number of persons had been provided by the ship to render any necessary assistance.

[1] While Mr. McKay was testifying, I got the impression, not only for what he said, but also from his manner, that his recollection as to how he received the injury was not particularly good, and I cannot find that the libelant has sustained the burden of proving that the first officer controlled his actions or interfered with them. He had decided to go ashore as many of the other passengers had done; he knew as well as any one that the

tender was rolling, for he had been observing it as he stood on deck, and while those ahead of him were boarding her. This was not his first experience around the water. He could not fail to have realized that there was some risk, though not a very great one, for an able-bodied man, and the inference is that whatever injury he received must have been due to his own lack of care in watching the gunwale of the tender which he was about to step over.

[2] In Goode v. Oceanic Steam Nav. Co.— 251 F. 556, 163 C. C. A. 550, the Circuit Court indicated that it was not negligence if the seaman or the first officer, as in the present case, took the usual course with persons who were apparently strong and able to take care of themselves. Carriers of passengers have the right to assume that passengers will exercise the care of a reasonably prudent man. The Tourist (D. C.) 265 F. 700. The obligation to warn applies to a danger unknown to the passenger. Tietz v. International Railway Co., 78 N. E. 1083, 186 N. Y. 347, 10 L. R. A. (N. S.) 357, 9 Ann. Cas. 1020.

[3] The question involved in the case at bar is similar to the one in The Anglo Norman, Fed. Cas. No. 393, where it was held that, where a passenger voluntarily encounters "a seen danger," and receives an injury in consequence of his own carelessness or awkwardness, he cannot recover. See, also, Elder Dempster Shipping, Ltd., v. Pouppirt, 125 F. 632, 60 C. C. A. 500, reversing (D. C.) 122 F. 983.

Accordingly the libel is dismissed.