## THE VULCANIA.

No. 366.

District Court, D. Massachusetts.

June 21, 1934.

Frank S. Deland, James M. Hoy, and M. Michelson, all of Boston, Mass., for libelant.

Homer L. Loomis and Loomis, Williams & Donahue, all of New York City, for claimant.

BREWSTER, District Judge.

This proceeding in rem is brought against the motorship Vulcania to recover for personal injuries received by libelant while on a cruise in the Caribbean waters. The owner, Cosulich Line, is claimant.

### Statement of Facts.

The libelant was a first-class passenger on the motorship Vulcania on a West Indies cruise from New York in February, 1931. His contract entitled him to excursions from the vessel, giving him the option to land at different ports, including La Brea, Trinidad. On February 19, 1931, the Vulcania reached the port of La Brea, but, due to the shallow water, she anchored about a mile off shore. Passengers who desired to visit La Brea were transported in motorboats and lifeboats which were carried on the Vulcania. Each motorboat towed a lifeboat. There were four of these used for the purpose on that day. The lifeboats carried 75 and the motorboats 50 persons. Libelant and several of his witnesses were in No. 9 lifeboat, towed by motorboat No. 17. On the lifeboat were two seamen, and on the motorboat were the fourth officer, who was in charge, two stewards, an engineer, and two seamen. The motorboat came alongside the dock at La Brea and was tied up to it by hawsers, one at each end. The lifeboat was drawn up beside the motorboat on the latter's port side so that the two boats were in contact for some distance amidships. The method of landing the passengers on this day differed in no material respect from that usually adopted when passengers were allowed to take side trips from the Vulcania when anchored at a distance from the land.

There is a difference in the recollection of witnesses as to the means adopted to hold the lifeboat in position. Some testify that it was held by two ropes running to the pier; others say it was held in place by the two seamen using boat hooks. In the absence of any evidence that the boats departed from their relative positions or that the seamen were not attending to their duties, the conflict is not a material factor. The sea was only "slightly choppy." There was a swell which caused more or less continuous motion to the boats but no more than was to be expected under favorable conditions. There was no evidence to sustain the allegation that the debarkation took place in a "rolling sea."

The passengers from the motorboat first debarked, stepping onto the pier from the boat. Passengers in the lifeboat (No. 9) stepped onto the seat which ran around the inner side of the boat a foot below the gunwale and thence onto a similar seat similarly placed on the motorboat, and from the motorboat they reached the dock. They were requested to step from one boat to the other at the center point of contact, and many of them did so without experiencing any difficulty. Some were assisted by the stewards, who stood amidships on the motorboat ready to assist any who desired; others stepped across without assistance. The libelant was one of those who chose to step over without waiting to be assisted, and in the act he fell and received the injuries complained of. Just what happened is not clear. Whether he tripped as he stepped over the gunwales of the vessels, or whether he failed to get a secure footing on the seat of the motorboat is a matter open to doubt on the testimony. All witnesses agree that he did not fall forward, but rather his feet slipped out from under him, leaving him sitting in the bottom of the motorboat. The fall resulted in strained muscles of the leg, which was the principal injury complained of. The libelant testified that he was in the bow of the lifeboat; that he arose, stepped

over one seat toward the middle of the boat; that one steward or member of the crew on the motorboat stood with his back toward the libelant, whereupon he proceeded unassisted to step into the motorboat with the result as above stated. His witnesses, however, and the witnesses for the claimant give a somewhat different version of what occurred. They place him at the stern of the boat before the accident. Libelant's witnesses say he stepped across near the middle of the boat. Claimant's witnesses say he fell directly in front of the motor, which is placed near the stern. If the libelant had awaited his turn, on his own testimony he would have been one of the last to leave the lifeboat, and the evidence is that when he fell there were several passengers who were still to be landed.

The libelant was a vigorous man, in the prime of life, who described himself as having been at the time unusually agile and active. I regard it as a fair inference of fact that his confidence in his ability to proceed without aid and his impatience led him to attempt to step from one boat to the other at a point somewhat nearer the stern than the point of contact between the two boats, and, while so doing, a movement of one or both of the boats caused him to lose his balance and, before he could regain it, he slipped off of or overstepped the seat on the motorboat and fell, as described above. I so find.

After the accident, libelant returned to the Vulcania in No. 17 and continued on the Vulcania to the end of the cruise. The injuries received were not serious. No fractured bones were discovered. The muscle of the left leg had been ruptured. The injury caused pain. It resulted in partial disability for a period, and expenses were incurred for medical advice and treatment, but, since I find no liability, I need not go into the extent of the damages sustained.

### Conclusions of Law.

The claimant interposes two defenses to the libel, either one of which determines the controversy. It is contended, in the first place, that the facts do not sustain the charge of negligence on the part of the Vulcania or of its officers or crew. With this contention, I agree. It can hardly be argued that the Vulcania was at fault in permitting the passengers to land at La Brea on the day in question, with weather fair and sea calm or only slightly choppy. Nor is there any basis for the claim that the facilities furnished for the transportation were inadequate or improper. The boats were staunch and seaworthy. I find that they were adequately manned. The evidence falls short of proving that the officer in charge or any of the crew on the boats was guilty of any negligent act or refusal to act. I am not satisfied from the evidence that the fourth officer was not exercising due care in placing No. 9 boat alongside of No. 17. It was the way which he had adopted at all other landing points except one. The conditions were favorable, affording no reason to think that the usual practice was not the proper one. Libelant presented evidence tending to show that transferring passengers from one boat to another is a procedure attended with hazards, but it added nothing to the dangers obvious to any one of ordinary intelligence. Assistance was available for those who desired aid. If we accept as true that one of the stewards had momentarily turned his back upon the passengers of No. 9, it was no more than could reasonably be expected from one who was engaged in helping passengers across the motorboat to the dock. The libelant was one of about 60 passengers in No. 9, and it may very well have transpired that, when he started to step over, the stewards were otherwise employed. There is no suggestion of a refusal to lend aid in response to a request. If the libelant elected not to wait for assistance, he must assume the responsibility for the election and for its consequences. The libelant was apparently able to take care of himself, and the steward had a right to assume that he would exercise the care of a reasonably prudent man. The Empress of Scotland (D. C.) 11 F.(2d) 783; Goode v. Oceanic Steam Nav. Co., Ltd. (C. C. A.) 251 F. 556.

The want of due care on the part of the libelant as the sole contributing cause defeats his rights to recover. The Anglo Norman, Fed. Cas. No. 393.

The facts in the Goode Case were much more favorable to libelant than are those of the case at bar. There the seamen rendered assistance but in such a way that it might have been regarded as carelessly rendered. Nevertheless, the libelant was not permitted to recover, on the ground that the facts did not warrant a finding of negligence.

The second defense assumes negligence on the part of those acting for the Vulcania, but denies the right to libel the Vulcania in rem, while conceding, upon the assumed negligence, the right to proceed in rem against No. 17 or No. 9, or both, or in personam against the owners.

This point has been fully and ably briefed by claimant. The doctrine, for which the

claimant contends, concisely stated, is that the in rem remedy for personal injuries is confined to those sustained on, in, or about the vessel, or caused by some act or failure occurring on the offending vessel; that the Vulcania cannot be libeled in rem for the fault of another vessel on any theory of agency or common ownership; that No. 17 and No. 9 were vessels within the admiralty sense [The Jack-O-Lantern, 258 U. S. 96, 42 S. Ct. 243, 66 L. Ed. 482. The Showboat (D. C.) 47 F. (2d) 286; 1 USCA § 3] and as such are to be "treated as endowed with personality" (Holmes, Common Law, p. 26).

The propositions I think may be accepted as good admiralty law, but whether they apply to the facts of this case is a debatable question, the answer to which I do not deem necessary to the decision of this case.

A decree may be entered dismissing the libel.