**ERDMAN v. UNITED STATES et al.**

**No. 280.**

Circuit Court of Appeals, Second Circuit.
June 1, 1944.

L. HAND, Circuit Judge, dissenting.

————◇————

Before L. HAND, SWAN, and CHASE, Circuit Judges.

Pyne and Lynch, of New York City (Warner Pyne, Leo J. Bondy, and J. Norman Lewis, all of New York City, of counsel), for libellant-appellee.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Vernon Sims Jones, Raymond Parmer, and Walter X. Connor, all of New York City, of counsel), for respondents-appellants.

CHASE, Circuit Judge.

The libellant is a resident of the City of New York who was seriously injured in the swimming pool of the ship while a passenger on the S. S. California during a voyage from New York to San Francisco. He sued under the provisions of the Suits in Admiralty Act, 41 Stat. 525, 46 U.S.C.A. § 741 et seq., to recover for his injuries and elected to proceed according to the principles of an action in rem. He joined as respondents various parties other than the appellants upon alternative allegations that the ship was either owned or operated by them, but nothing further need be stated in this regard than that it was established

that the United States was the owner and the appellants American Line Steamship Corporation and Atlantic Transport Company of West Virginia, while operating the ship as a common carrier, were transporting the libellant as a passenger for hire on the voyage already mentioned. The trial judge found that the negligent failure of the operators to warn the libellant of the dangerous condition of the swimming pool maintained for passengers' use and his own contributory negligence in attempting to use it combined to cause his injuries. A decree for half damages was entered for the libellant, from which the appellants above named appealed. The libellant was dissatisfied because not awarded full damages and also filed assignments of error.

The following facts were found on evidence which adequately supported the findings. On February 10, 1938, when the ship was between Havana and the Canal Zone, heavy seas were encountered and the vessel pitched so much that during the morning the swimming pool located on B deck forward was emptied to prevent the water then in it from splashing out onto the deck. In the afternoon the ship changed her course, and about three o'clock the pitching and rolling had so decreased that orders were given to fill the pool. About an hour later when the filling was about half completed the libellant entered it and was washed so hard against one side by the waves in the pool that he was badly hurt.

The pool was about twenty-three feet wide, nineteen feet long and nine feet five inches deep. It was properly constructed, and the only fault charged to the appellants and now relied upon was that they failed to give the libellant due warning that the action of the water in it made an attempt to use it when he did unusually dangerous. It was shown that the walls of the pool extended about two feet above the deck, and at the top of these walls was a raised platform which ran all the way around the pool. At each end of the platform which was at the after end of the pool there was a short flight of steps leading from the deck to it for the use of passengers entering the pool, and on the inner side of it were two ladders equipped with suitable hand rails which led down into the pool, one near each end of the platform. Extending up from the deck along the outer edge of each of the two platforms paralleling the sides of the pool was a row of stanchions about five and one-half feet high with holes near their tops, through which a three-inch rope was passed and fastened, one end to the stanchion at the after end of each platform and the other to a bulkhead along the forward side of the platform at the forward end. When the pool was not open for use the passageway at each end of the after platform was closed by a smaller rope hung across it from the nearest stanchion to an eyebolt about three and one-half feet above the deck in a bulkhead aft. Then the pool was entirely enclosed by ropes. When it was opened for use by passengers the ropes across the passageways were unfastened from the stanchions and bent back to a jackstay on the bulkhead. Until this was done an adult attempting to go onto the platform by way of the steps would be prevented from so doing unless he deliberately stooped under or climbed over the rope at the top. Nothing was done by way of having signs or an attendant at the pool to give passengers notice as to when it was open or closed for passengers' use.

There was a sharp conflict in the evidence about whether the removable rope at the top of the steps leading to the platform was in place across the entrance where the libellant went up the stairs and onto the platform. He testified that it was not, other witnesses could not remember, and others testified that it was. The trial judge was unable to determine the fact of the matter and held that the respondents were at fault regardless of whether the rope was up or down because it was an inadequate warning anyway. He held that the respondents were negligent in failing to have some sign other than the rope to warn passengers not to use the pool or to have an attendant there for that purpose. We think it was error to hold the respondents liable for their failure to give the libellant some other kind of warning because the record discloses that the rope alone, when across the entrance, was sufficient to give the libellant to understand that the pool was not open for use and that he was forbidden to use it. Such information, however conveyed to him, fulfilled the respondents' duty to this libellant. While he was testifying at the trial, his attention was called to the fact that there had been some testimony that when he walked up the steps to go to the ladder to enter the pool he stooped or bent down or went under a rope and he was asked what he had to say on the subject. He then testified that no

rope was up, and added, "I would not stoop, bend or get under any rope under any consideration to get into the pool." This answer shows beyond question that the rope when in place was all that he needed as a warning not to go past it and into the pool.

■■ The libellant undoubtedly had the burden to prove by a fair preponderance of the evidence that some negligence of the respondents was the proximate cause of his injuries. As his evidence did not overcome the evidence that the rope was in place across the entrance, that fact was left so uncertain that no finding was made one way or the other by the trial judge. Whether the evidence on this subject did preponderate in the libellant's favor depended largely, if not wholly, upon the credibility of the witnesses that the judge heard. There was nothing in the general situation disclosed by the evidence which made it inherently impossible either that the rope was in place to bar the entrance or that it was not. If it was across the entrance the libellant's own testimony was an admission that he had been sufficiently warned not to go into the pool and that he ignored that warning when he went in and was hurt as a result. Thus he failed to prove any negligence on the part of the respondents since he did not carry the burden of overcoming the affirmative evidence in the case that the respondents did in fact give him the kind of notice which he admitted would have made him understand that the use of the pool was forbidden to passengers.

■ Although it may be that passengers on steamships are prone to ignore warnings given for their safety, and it is certainly true that common carriers are bound to exercise a high degree of care to protect them from harm, The Arabic, 2 Cir., 50 F.2d 96, adult passengers need not be treated as though they were wholly lacking in intelligence and common sense. In re Keansburg Steamboat Co., 2 Cir., 249 F. 472; The Tourist, D.C., 265 F. 700; The Empress of Scotland, D.C., 11 F.2d 783.

■ The respondents, having withdrawn any general invitation to passengers to use the pool and having brought home to the libellant that fact by means of the rope, were under no duty to warn him of the dangers he would probably encounter in using it. Forbidding its use entirely, as we must take for granted was done since the libellant did not carry his burden to overcome the respondents' evidence to that effect, did away with any duty on the part of the respondents to advise him of specific risks he would incur by going into the pool. During the time the pool was roped off they had the right to assume that he would stay out; and until they had notice of the contrary and failed to take advantage of a clear chance to prevent his being harmed by his own heedlessness they owed him no further duty in respect to the pool. There was some slight evidence that the respondents did have a last clear chance to prevent his going into the water after he had started down the ladder into the pool, but it was not enough to support any finding to that effect and none was made.

The libellant, therefore, failed to show that his injuries were caused by any fault other than his own. Consequently he did not prove that the respondents, or any of them, were liable.

Decree reversed and libel dismissed with costs.

L. HAND, Circuit Judge (dissenting).

This case comes to us in a most artificial way, because of the judge's inability to decide whether the guard rope was in place when Erdman entered the pool. We must therefore decide the ship's negligence on the assumption that it was in place, and contributory negligence on the assumption that it was not in place; for the burden shifts as to the second. There is a good deal of force in the ship's argument that it was enough warning to put a rope across the entrance. It would not have been, it is true, for children; but it is perhaps a little doubtful whether adult passengers were entitled to more. What were they to expect when they saw such a rope? Plainly, that they were meant not to pass it. Why were they not to pass it? Because the pool was not then fit to bathe in. Why was it not fit? That must have been because it was not safe. Certainly, bathing in a half-filled pool would not hurt the pool; it could only be to protect the passengers themselves that they were to keep out. That makes a perfect case perhaps for contributory negligence; but not, I think for adequate care on the ship's part. Passengers are notoriously wayward and lawless; they do not obey instructions, and a ship should be operated on the assumption that they are what they are. On the other hand a ship's duties do end short of

keeping passengers in tutelage. What more could she do? A warning sign would have helped, if it had said that the pool was dangerous, thus bringing expressly to mind what a rope only meant by implication. However, I do not stand on that, for there was more. A steward was at hand to tend to the wants of those passengers who lay or sat about. He saw Erdman enter the pool; and if the judge had believed him when he said that he told Erdman not to go into the pool, the ship had done her full duty. We must assume, however, that he said nothing; and, if he did not, it was a failure in that extreme care which the law exacts of a carrier of passengers. The ship, having stationed a steward at the place, was charged with instructing him to tell passengers not to enter.

As to contributory negligence, as I have said, we must assume that the guard rope was not in place; and there was therefore no warning at all not to go into the pool. The question then becomes what dangers were apparent. I have a little doubt whether there were apparent dangers of any kind. The judge did not find that any other passengers warned Erdman, and what Erdman himself admitted as to what Michael told him, was not, properly speaking, a warning. Nevertheless, no other passenger did try to go in, and, even though the guard rope was not in place, it was apparent that the pool was not yet ready for passengers. I think that, if a passenger uses a part of the ship which is obviously not intended for passengers, he takes some chances. If he goes into the engine-room, or into the crew's quarters, or upon decks which he knows are not open for passengers, he cannot expect the same care which the ship owes him elsewhere. A pool that is being filled is not a pool meant for passengers. Anyone who uses it, is charged with knowledge that the ship does not extend to him the usual protection.

The ship argues that, having taken some risks, Erdman took all. There are no doubt expressions to that effect in the books, but it seems to me that this is plainly wrong. A man may take some chances without taking other chances of which he has no warning. All that Erdman should be charged with was the general dangers which might be present when he went where passengers should not go; not with foreseeing that, when the ship pitched, the swash of the water would have such force

as it did. His disregard of his safety was not to be measured as exposing him to that specific danger. All this would be much better illustrated, if we could divide the damages proportionately; but the issue was answered, as soon as the judge found that Erdman was negligent in any degree whatever.