### FETAN v. ATLANTIC & CARIBBEAN STEAM NAV. CO.

No. 4727.

District Court, E. D. New York.

June 16, 1932.

Lavenburg & Lavenburg, of New York City (William S. Butler, of Brooklyn, N. Y., of counsel), for plaintiff.

Bigham, Englar, Jones & Houston, of New York City (James W. Ryan, of New York City, of counsel), for defendant.

BYERS, District Judge.

This is a common-law action in which the plaintiff seeks to recover damages for personal injuries sustained by him on June 28, 1931, while he was in the act of boarding the defendant's steamship Caracas, offshore, in the harbor of Santa Anna, island of Curacao, Dutch West Indies.

At the close of the taking of testimony, both sides moved for the direction of a verdict, without reservation. This requires that this court shall decide all questions of fact and law. See Williams v. Vreeland, 250 U. S. 295, 39 S. Ct. 438, 63 L. Ed. 989, 3 A. L. R. 1038, Beuttell v. Magone, 157 U. S. 154, 15 S. Ct. 566, 39 L. Ed. 654. And in addition there was an express stipulation to this effect in the record.

The plaintiff had taken first-class passage at Maracaibo, Venezuela, for New York, and the ship had put in at Curacao for a scheduled stop on the north-bound voyage. The hour of arrival is not stated, but the plaintiff says he went ashore at about 9:30 a. m. on personal errands, returned in an hour or so, and again left the ship, about 10:45 a. m., knowing that a notice had been posted to the effect that the ship would sail at 1:00 p. m.

The Caracas had berthed at the fuel dock on her arrival, and there were no facilities for passengers to go ashore from a companionway swung to the dock. Instead, an accommodation ladder was lowered outboard, to enable those desiring to go ashore to do so by entering small boats which were available for that purpose. Thus it was that the plaintiff made his way ashore on these two occasions.

Being ashore for the second time, he says he acquired the notion that the ship would sail at 1 p. m. from the company's dock (instead of the fuel dock) and that he made his way thence in season. Discovering his error, he procured transportation to the fuel dock, just as the ship was making out. He asked a nearby native boatman operating a motor launch to take him out to the ship.

The launch was a customs boat, and the operator was not an employee of the defendant.

The plaintiff entered the launch, which came alongside to starboard, at an estimated distance of some 300 meters or thereabouts from the fuel dock. The plaintiff had a parcel in his left hand, and grasped the outboard hand-rail of the accommodation ladder with his right; he placed his left foot on the lower step of the accommodation ladder, while his right foot rested on the thwart of the motor launch. In attempting to place his right foot on the lower step of the ladder, he missed his footing, and his right leg below the knee became jammed between the launch and the accommodation ladder, cutting two veins in the front of the leg near the shin-bone.

The plaintiff righted himself without assistance, made his way up the ladder, reached the deck of the ship safely, and within a short interval received competent medical attention. The injuries thus sustained were serious in that continued care and attention were required after he reached New York, and the healing process had not completely restored the tissues to their normal condition at the time of trial.

The testimony of the boatman, taken under deposition by the defendant, was not contradicted, that he endeavored to prevent the plaintiff from seeking to step on the accommodation ladder at the moment that he made the attempt, the launch being about 1½ feet from the lower step of the gangway, and the boatman's gestures in that behalf are well corroborated by the testimony of other witnesses to the happening, called by the defendant.

The plaintiff's brief candidly states that the controlling question in the case is whether the accommodation ladder was lowered by the ship for the specific purpose of enabling the plaintiff to come aboard, after departure was had from the fuel dock.

It is thought that the evidence is with the defendant on that issue, for reasons that may be briefly related:

As the vessel lay berthed, her port side was alongside the fuel dock. Three lines forward and three lines aft were made fast from the port side to the dock; in addition there were two lines offshore, from the starboard side, right across the little bay or harbor (which is 350 feet wide), made fast in some undisclosed way.

When the ship was about to sail, the port lines were first let go; this was at 1:14 p. m.; then the starboard lines were let go; and then the engines were put in head motion. The engine-room log shows that at 1:12 p. m. the stand-by signal came from the bridge; at 1:24 p. m. the port engine was signaled slow ahead.

It will be seen that thirteen minutes elapsed between letting go the first line, and the signal to the engine-room that put the port engine into head motion.

The master's testimony was not disputed, that the accommodation ladder was left in position, on the starboard side, to enable the pilot to come aboard, just before the lines were cast off.

There was no testimony that the accommodation ladder had been raised at any time prior to the plaintiff's clambering aboard, save his. It may be thought that the boatman corroborated him, but the latter's testimony is not thought to be to this effect, for reasons presently to be stated.

The second officer was assigned to the poop deck, astern, at sailing, and his duties involved supervision of letting the lines go and heaving them in; when this had been accomplished, he sent the men under him forward to the starboard side to heave in the gangway or accommodation ladder.

This was not done until the vessel had proceeded from the fuel dock, up the small Santa Anna Bay into the Schottegat, where a full turn to starboard was made, and the ship was headed back again, and down Santa Anna Bay, and to sea. The turning maneuver is required as and where described, because it cannot be executed with safety in the narrow waterway where the fuel dock is located.

The turn had been made, and the Caracas was about off the fuel dock again on her way to sea, when the gangway was hove inboard.

That was after the plaintiff had come aboard.

The plaintiff's testimony to the contrary is not accepted; first, because it is thought that, in his haste, he did not carefully observe the exact conditions; second, because he said he had been spending some time in the International Café on his second visit ashore, which may account for his seeking the ship at the wrong place when he set out to return; and, finally, because, if the gangway had been lowered for the plaintiff's accommodation, it is believed that the ship's way would have been stopped to enable him to come aboard without difficulty. His own testimony is that, as he was in the act of stepping on the gangway, the engines were in motion, creating ripples on the water, causing the gangway to sag 12 or 14 inches just as he attempted to place his right foot on the lower step.

If the engines were put in motion at that time, it was because the officer on the bridge (the master) was unaware of the plaintiff's coming aboard. Hence the gangway had not been lowered for his use, or otherwise.

This conclusion is not impaired by the testimony of Heereveen, the boatman, as follows (eleventh cross-interrogatory):

"Q. Is it not a fact that the ship's gangway was lowered by the ship's employees upon the arrival of the motor launch alongside the S. S. Caracas?

"A. Yes."

The form of the question leaves something to be desired. It might have conveyed the impression that the witness was being asked if the act of lowering had been performed "upon" (at) the arrival of the launch, i. e., if the gangway was in a lowered position "upon the arrival" of the launch. The certificate accompanying the deposition recites that some of the questions were translated into the Dutch language, and that "practically all of his answers were in the English language and that those and parts of those in the Dutch language were properly and correctly interpreted and recorded."

Whether this particular query was so translated does not appear. While it is true that, to the person of ordinary discrimination, the difference between "was" and "had been" would be clear, it cannot be thought that a Dutch harbor boatman of Curacao would necessarily perceive the distinction, and answer the question in accordance with the exact facts.

The burden of proof has not been sustained on this issue.

The plaintiff relies upon expressions contained in the opinions in The Empress of Scotland (D. C.) 11 F.(2d) 783, and Goode v. Oceanic Steam Nav. Co. (C. C. A.) 251 F. 556. In both cases, passengers were disembarking from their respective ships onto small

craft, for the purpose of shore trips. The passenger in each case (and negligence was found in neither) was performing an act under the direct supervision of one or more officers and sailors. This plaintiff was engaged in the hazardous effort of boarding a moving ship offshore, without the knowledge, much less the supervision, of any officer or seaman. That is to say, the plaintiff has failed to prove that there was committed by the defendant any breach of duty owing to the plaintiff.

Comment is made in plaintiff's brief, upon the defendant's failure to call the quartermaster, who, according to the plaintiff's recital, was standing at the gangway when the plaintiff approached in the launch; it is related that he first waved to the launch to come alongside, and then lowered the gangway to enable the plaintiff thus to board the ship.

No profound knowledge of the customs of the sea, or of discipline aboard ship, is required to reveal the inherent defects of such a narrative. The gangway would not have been lowered by the quartermaster upon his own initiative. If he did that, it was only pursuant to an order from the officer in charge of navigating the ship—in this instance the master, who was on the bridge. Such an order would have involved knowledge of the presence of the launch, and the purpose of the plaintiff in desiring to resume the status of passenger. This, the master unequivocally denies.

Such knowledge and such an order would have been accompanied by directions to the boatman for coming alongside, when the ship's way had been stopped, and necessary supervision of the plaintiff's boarding the ladder, and physical assistance if required.

For these reasons, the plaintiff's bare statement, that the quartermaster lowered the gangway, cannot be accepted.

The master testified that the one quartermaster who was on watch was at the wheel, taking his orders from the bridge, because the vessel had left her dock. The other two quartermasters were below, off duty. The only hand on deck at the time was the deck steward, who testified that nearly all the passengers were having their noonday meal at this time, which accounts for the absence of lay witnesses.

The failure, therefore, to call the one quartermaster who was on duty, if he was available at the time of the trial, raises no presumption that his testimony would have been favorable to the plaintiff.

Because of the plaintiff's failure to sustain his burden of proof, judgment will be directed for the defendant, with costs.

Settle judgment on three days' notice.